IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                          No. CR 21-0857 JB

EUSEBIO IKE DEVARGAS,

      Defendant.

**<u>MEMORANDUM OPINION</u>**[1]

---

[1]This Memorandum Opinion follows the Court's Memorandum Opinion and Order, filed January 10, 2022 (Doc. 132), disposing of: (i) the United States' Motion in Limine to Exclude Defendant's Self-Serving Statements as Inadmissible Hearsay, filed October 20, 2021 (Doc. 45); (ii) the United States' Motion in Limine to Exclude Evidence of Possible Penalties, filed October 20, 2021 (Doc. 46); (iii) the United States' Motion in Limine to Prohibit Unfounded Allegations of Government Misconduct or Irrelevant Challenges to the Quality of the Government's Investigation, filed October 22, 2021 (Doc. 48); (iv) the United States' Motion in Limine to Prohibit Discussion of Defense Exhibits Not Previously Provided to the United States, filed October 22, 2021 (Doc. 49); (v) the United States' Motion in Limine to Prohibit Evidence of Defendant's Personal Beliefs About the Second Amendment, filed November 5, 2021 (Doc. 62); (vi) the United States' Motion in Limine Regarding Admission of Defendant's Prior Conviction Documents, filed November 5, 2021 (Doc. 63); (vii) the Defendant's Motion to Dismiss, filed November 9, 2021 (Doc. 71); (viii) the Defendant's First Motion to Suppress Evidence, filed November 9, 2021 (Doc. 72); (ix) the Defendant's Second Motion to Suppress Evidence, filed November 10, 2021 (Doc. 74)("Second MTS"); and (x) the Defendant's Third Motion to Suppress, filed November 9, 2021 (Doc. 73)("Third MTS"). In the Memorandum Order and Opinion, the Court detailed its rationale for denying the MTD, and indicated that it would, at a later date, issue a Memorandum Opinion more fully detailing its rationale for its decisions on the other nine motions. Memorandum Opinion and Order at 1. This Memorandum Opinion is the promised opinion on the Second MTS and the Third MTS. On May 12, 2022, unbeknownst to the Court or its law clerks, the Court's Courtroom Deputy filed a Judgment in a Criminal Case, filed May 12, 2022 (Doc. 177), before the Court issued this promised opinion. The Court nevertheless issues the promised opinion to explain why it denied the Second MTS and the Third MTS before trial, and because it promised it would issue the opinion. The Court also notes that, because the opinion has already been appealed, the records, including the Recording of the June 2, 2021 Interview, have already been surrendered to the Tenth Circuit, and the Court, therefore, did not include pincites to the Recording in its opinion.

**THIS MATTER** comes before the Court on: (i) the Defendant's Second Motion to Suppress Evidence, filed November 10, 2021 (Doc. 74)("Second MTS"); and (ii) the Defendant's Third Motion to Suppress, filed November 9, 2021 (Doc. 73)("Third MTS").  The Court held an evidentiary hearing on the Second MTS and the Third MTS, along with other pretrial matters, on December 28, 2021.  See Clerk's Minutes at 1, filed December 28, 2021 (Doc. 117).  The primary issues are: (i) whether the Court should suppress evidence of a firearm found in Defendant Eusebio Ike DeVargas' home, because (a) the search warrant affidavit supporting the Federal Bureau of Investigation's ("FBI") search of DeVargas' home does not establish probable cause where the affidavit does not provide specific allegations of criminal activity occurring at DeVargas' home, (b) the search warrant affidavit is so devoid factually that the officers' reliance on the warrant is unreasonable, and (c) the firearm would have been discovered inevitably when officers executed the arrest warrant on DeVargas; and (ii) whether the Court should suppress statements that DeVargas made during an interrogation, because (a) DeVargas asserted his right to counsel, and (b) DeVargas did not voluntarily waive his right to counsel.  The Court concludes that: (i) the Court will not suppress the firearm in DeVargas' home, because (a) the search-warrant affidavit has a sufficient factual basis to establish probable cause that officers would find evidence of criminal activity at DeVargas' residence, (b) the officers relied on the search warrant in good faith, and (c) the firearm would inevitably have been discovered; and (ii) the Court will not suppress DeVargas' inculpatory statements, because (a) he did not assert his right to counsel, and (b) he voluntarily, knowingly, and intelligently waived his right to counsel.  Consequently, the Court will deny the Second MTS and the Third MTS.

# FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to a search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). "[H]earsay testimony is admissible at suppression hearings . . . and should be considered by a district court[.]" United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)(citing United States v. Matlock, 415 U.S. 164, 173 (1974)).[2]

---

[2]In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court of the United States of America held that the introduction of testimonial hearsay statements from witnesses not subjected to cross examination at trial violates a defendant's Sixth Amendment confrontation right. See 541 U.S. at 68-69. There is no binding precedent from the Supreme Court or the United States Court of Appeals for the Tenth Circuit concerning whether Crawford v. Washington applies to pretrial suppression hearings. The Tenth Circuit has indicated in unpublished caselaw that Crawford v. Washington does not bar hearsay statements at a suppression hearing. In United States v. Ramirez, 388 F. App'x 807 (10th Cir. 2010)(unpublished), the Tenth Circuit notes:

> It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has not yet indicated whether the Confrontation

In its Memorandum Opinion and Order, filed January 10, 2022 (Doc. 132)("MOO"), the Court provided a Factual Background.  See MOO at 3-8.  The Court also makes its factual findings from the Criminal Complaint, filed May 17, 2021 (Doc. 1)("Complaint"), the Second MTS, the Third MTS, the Amended Application for a Warrant by Telephone or Other Reliable Electronic Means, filed November 10, 2021 (Doc. 74-4)("Search Warrant Application"), and the evidence and arguments made at the December 28, 2021, evidentiary hearing.  The Court recognizes that, insofar as the Court draws facts from the Complaint, these facts largely reflect the United States' version of events.

---

Clause applies to hearsay statements made in suppression hearings. See United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. [2009]), cert. denied, [558] U.S. [890] . . . (2009)(collecting cases).  Nonetheless, even if we assume that the Confrontation Clause applies to the hearings at issue here, the admission of the confidential informant's statements was harmless.

388 F. App'x at 810.  Moreover, based on the same reasoning as the Tenth Circuit in United States v. Ramirez, 388 F. App'x 807 (10th Cir. 2010)(unpublished), the Court has concluded that hearsay statements are admissible in a detention hearing.  See United States v. Hernandez, 778 F. Supp. 2d 1211, 1227 (D.N.M. 2011)(Browning, J.)("Before Crawford v. Washington, courts held that the Confrontation Clause did not attach to detention hearings. Nothing in the Supreme Court's opinion in Crawford v. Washington undermines those holdings. Moreover, what authority exists after Crawford v. Washington rejects the proposition that Crawford v. Washington applies outside of trial.").  Moreover, other Courts of Appeals that have addressed this question have held that hearsay evidence's introduction at pre-trial proceedings does not violate the Confrontation Clause. See Peterson v. California, 604 F.3d 1166 (9th Cir. 2010)(concluding that the admission of hearsay evidence at a preliminary hearing does not violate the Confrontation Clause, because the right to confrontation is a trial right).  See also United States v. Mitchell-Hunter, 664 F.3d 45, 52 (1st Cir. 2011)(holding that the defendant did not have a confrontation right in a pretrial jurisdictional hearing).  Consequently, the Court concludes that admission of hearsay testimony at the suppression hearing does not violate DeVargas' confrontation rights.

1.      **January 7, 2021, Stop.**

1.      On January 7, 2021, Rio Rancho Police Department Officer Petross observed a Nissan truck with an expired registration traveling near Rio Rancho, New Mexico.  See Complaint ¶ 5, at 3.

2.      Petross performed a traffic stop on the Nissan truck and identified DeVargas as the driver.  See Complaint ¶ 6, at 3.

3.      Petross noticed an odor of alcohol from the vehicle, and DeVargas told Petross that he drank one shot of vodka approximately two hours before the stop.  See Complaint ¶ 6, at 4.

4.      Before conducting a Standard Field Sobriety Test, Petross asked DeVargas if he had any weapons on him, and DeVargas stated that he had a firearm.  See Complaint ¶ 7, at 4.

5.      DeVargas showed no signs of impairment during the Sobriety Test, and Petross returned DeVargas' firearm and released him from the scene.  See Complaint ¶ 8, at 4.

6.      Shortly thereafter, Petross realized that DeVargas had a felony conviction and should not possess a firearm, but officers could not relocate DeVargas.  See Complaint ¶ 8, at 4.

2.      **April 10, 2021, Stop.**

7.      On April 10, 2021, Bernalillo County Sheriff's Office ("BCSO") Field Services Deputy Alfred Duchaussee observed DeVargas wearing dark clothing riding a red bicycle near the intersection of 2nd St. NW and Candelaria St. NW in Albuquerque, New Mexico.  See Complaint ¶ 9, at 4.

8.      DeVargas was riding southbound on 2nd St. without a front mounted head light or rear reflector.  See Complaint ¶ 9, at 5.

9.      When Duchaussee approached DeVargas, DeVargas pedaled faster and turned down Veranda St., which is a dead-end road.  See Complaint ¶ 10, at 5.

10.     DeVargas turned around, pedaled past Duchaussee and stated: "I did nothing wrong."  Complaint ¶ 11, at 5.

11.     Duchaussee attempted to apprehend DeVargas, who continued to state, "I did nothing wrong," and resist Duchaussee.  Complaint ¶ 11, at 5-6.

12.     DeVargas informed Duchaussee that he had a weapon, and Duchaussee approached and handcuffed DeVargas.  See Complaint ¶ 11, at 5-6.

13.     DeVargas informed Duchaussee that the weapon was in his front pocket, and Duchaussee recovered a firearm from DeVargas' pocket.  See Complaint ¶ 12, at 6.

14.     On May 17, 2021, the Honorable Jerry H. Ritter, United States Magistrate Judge for the United States District Court for the District of New Mexico, issued an arrest warrant for DeVargas for being a felon in possession of a firearm.  See Arrest Warrant, filed May 17, 2021 (Doc. 2).

**3.     The Search Warrant.**

15.     On June 2, 2021, the Honorable Laura N. Fashing, United States Magistrate Judge for the United States District Court for the District of New Mexico, issued a search warrant for DeVargas' home and another building, which houses Superior Automotive, located on the same property.  See Second MTS at 4.

16.     The Search Warrant Application alleges that DeVargas is a member of the Brew Town Locos ("BTL")[3] gang, and seeks to search his residence for evidence of firearms, drug trafficking, and gang activity.  See Second MTS at 4.

---

[3]Brew Town Locos is a gang in Albuquerque.  "Brew Town Locos are considered an 'old school' multi-generational Albuquerque gang, according to the FBI, in which new members are 'born into' the gang or recruited by ranking members."  FBI, ABQ unit target Brew Town Locos,

17.     The Search Warrant Application notes that the FBI Violent Crime Gang Task Force and Albuquerque Police Department Gang Unit have been investigating the BTL gang for approximately two years.  See Search Warrant Application ¶ 6, at 2.

18.     The Search Warrant Application states that DeVargas, among others, is suspected of participating in a conspiracy to distribute controlled substances to further BTL's objectives and purposes.  See Search Warrant Application ¶ 7, at 3.

19.     The Search Warrant Application further states that DeVargas, among others, is "currently being sought on U.S. District Court arrest warrants related to this investigation."  Search Warrant Application ¶ 9, at 4.

20.     The Search Warrant Application seeks "to search the premises the[] fugitives are associated with to apprehend and bring them before the court," and lists DeVargas' residence as a premises to search.  Search Warrant Application ¶¶ 9-10, at 4-5.

21.     The Search Warrant Application also contains the following information about Confidential Human Source 4 ("CHS-4"):

> **CHS-4** is a street and prison gang associate of BTL and has been for approximately 20 years.  CHS-4 knows several veteran BTL street gang members and at one time, CHS-4 distributed heroin with and among members of the BTL. During that period of time, CHS-4 relied on members of the BTL and a related prison gang for protection and to help CHS-4 collect drug debts.  Over the past few years, CHS-4 aided me in the collection of evidence against gang members and associates.  Information provided by CHS-4 led to the issuance of at least 27 federal search warrants, the arrest of multiple suspects, and the recovery of firearms, ammunition, U.S. currency and significant quantities of controlled substances. CHS-4 is motivated to assist the FBI to help reduce violent crime and drugs in the community. . . .  I consider the information CHS-4 provided to be reliable because much of it was corroborated through law enforcement investigation, controlled buys, and both physical and electronic surveillance.  To my knowledge, CHS-4's information has not been found to be false or misleading.

---

Albuquerque Journal, June 4, 2021, available at: https://www.abqjournal.com/2396973/fbi-abq-unit-target-brew-town-locos.html (last visited January 8, 2022)(no citation for quotation).

Search Warrant Application ¶ 40, at 16.

22.    In identifying the probable cause to search DeVargas' residence, the Search

Warrant Application states:

> EUSEBIO DEVARGAS is an associate of the BTL and has at least 12 prior
> arrests in New Mexico and Colorado.  EUSEBIO DEVARGAS has prior felony
> convictions for murder and aggravated fleeing a law enforcement officer.
> EUSEBIO DEVARGAS is currently wanted on a U.S. District Court arrest warrant
> for being a felon in possession of a firearm . . . and is currently on conditions of
> release in the related New Mexico State case.

Search Warrant Application ¶ 58, at 22.

23.    As to DeVargas, the Search Warrant Application further states:

> In April 2021, BTL suspected member EUSEBIO DEVARGAS was
> stopped on a bicycle a little after midnight by a BCSO patrol deputy within the BTL
> territory.  EUSEBIO DEVARGAS initially tried to evade the deputy but was
> subsequently contacted a short distance later.  EUSEBIO DEVARGAS told the
> deputy he had a pistol on his person and he was detained.  Deputies queried
> EUSEBIO DEVARGAS and learned he had several prior felony convictions, to
> include a homicide conviction.  [Confidential Human Source 4 ("CHS-4")] is a
> close associate of EUSEBIO DEVARGAS and advised EUSEBIO DEVARGAS
> was a BTL member and heroin addict.  CHS-4 said EUSEBIO DEVARGAS served
> as a lookout for several BTL dealers, who paid EUSEBIO DEVARGAS in dope.
> CHS-4 said the night EUSEBIO DEVARGAS he had been working as a lookout
> for the BTL and led the deputy away from a BTL drug house before submitting to
> arrest.

Search Warrant Application ¶ 107, at 34.

24.    Law enforcement officers observed DeVargas working on vehicles in front of his

residence in Albuquerque.  See Search Warrant Application ¶ 138, at 44.

25.    The Search Warrant Application states that DeVargas' residence is associated with

"Superior Automotive," which is an auto-repair and auto-related workshop.  Search Warrant

Application ¶ 153, at 51-52.

26.     The Affiant Officer, Leysha López, states: "I am aware that gang members and drug traffickers often utilize businesses, specifically car repair shops, to further their criminal activities."  Search Warrant Application ¶ 155, at 52-53.

**4.      June 2, 2021, Search.**

27.     Officers executed the Search Warrant and Arrest Warrant at DeVargas' home on June 2, 2021.  See Second MTS at 8.

28.     If the officers had only the arrest warrant for DeVargas, "[i]t would have made no change in how [they] entered the property."  Draft Transcript of Hearing at 52:3-8 (taken December 28, 2021)(Kastrin, Ubbelohde)("Tr.").[4]

29.     To execute the arrest warrant, the officers would have been at the threshold of the doorway to DeVargas' home.  See Tr. 53:1-3 (Kastrin, Ubbelohde).

30.     DeVargas allowed officers to enter his home to get a shirt for him, because he was not wearing a shirt when they arrived.  See Tr. at 55:6-11 (Kastrin, Ubbelohde).

31.     With DeVargas' permission, officers also put DeVargas' dog inside his home when he was arrested.  See Tr. at 55:19-22 (Kastrin, Ubbelohde).

32.     From the threshold of DeVargas' doorway, a rifle was in the officers' plain view.  See Tr. at 55:10-14 (Kastrin, Ubbelohde); Photograph of DeVargas' Bedroom 1 (dated June 2, 2021), admitted as Government's Exhibit 5D at December 28, 2021, Hearing; Photograph of DeVargas' Bedroom 2 (dated June 2, 2021), admitted as Government's Exhibit 5E at December

---

[4]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Accordingly, page and line numbers are subject to slight change in the final, filed transcript.

28, 2021, Hearing; Photograph of DeVargas' Bedroom 3 (dated June 2, 2021), admitted as Government's Exhibit 5F at December 28, 2021, Hearing.

33.     Based on DeVargas' arrest warrant for being a felon in possession, officers would have "continued to maintain [their] law enforcement presence on the residence," Tr. at 56:21-22 (Ubbelohde), and started writing a search warrant for DeVargas' home, see Tr. at 56:23-57-11 (Kastrin, Ubbelohde).

34.     Officers seized "a Springfield Rifle with the serial number 1377408, a 9mm KelTec sub 2000 handgun with the serial number FFSR39, ammunition, and a spent casing" from DeVargas' home.  Second MTS at 8-9.

### 5.     June 2, 2021 Interview.

35.     On June 2, 2021, after FBI and Task Force Officers ("TFO") executed the search warrant at DeVargas' home, officers arrested DeVargas.  See Third MTS Response at 2.

36.     After DeVargas' arrest, the TFO informed DeVargas that he had a right to a lawyer, pursuant to Miranda v. Arizona, 384 U.S. 436, 444 (1966)("Miranda").  See Third MTS at 1.

37.     In relevant part, DeVargas made the following statements in response to the TFO:

**Task Force Officer:**  Okay, so um, I'm a task force officer with the FBI and, obviously, we're executing a search warrant at your house.  Um . . . and I have an arrest warrant for you for the incident back in April, but before I want to talk to you about that and kinda get the bigger picture, I need to read you your rights.  Have you ever had your rights read to you before?

**Mr. DeVargas:**  Yes, ma'am.

**Task Force Officer:**  Yeah?  I'm going to switch over to that side because the. . . it's kinda loud here.

. . . .

**Task Force Officer:**  So, before I ask you any questions, you have to understand your rights, right.  So you have the right to remain silent, anything you say can be

used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer . . . .

**Mr. DeVargas:**  I have an attorney on this case.

**Task Force Officer:**  What's that?

**Mr. DeVargas:**  I have an attorney on this case.

**Task Force Officer:**  Hold on.  Um so that's a, that's a state side attorney for your state charges.  You haven't been arrested for your federal charges so it's a different ballgame.  Does that make sense?

**Mr. DeVargas:**  Yes ma'am.

**Task Force Officer:**  Okay.  So you have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during questioning.  If you cannot afford a lawyer one will be appointed for you before any questioning if you wish.  If you decide to answer questions now without a lawyer present you have the right to stop answering at any time.  Um do you have any questions about what I read to you?

**Mr. DeVargas:**  No ma'am.

**Task Force Officer:**  Is there anything that I need to clarify for you?

**Mr. DeVargas:**  No ma'am.

**Task Force Officer:**  Okay.

**Mr. DeVargas:**  I know my rights.

**Task Force Officer:**  Yea, yea, so we're going to proceed.  Is that okay?

**Mr. DeVargas:**  That's fine.

Third MTS Response at 2-3 (quoting Recording of June 2, 2021 Interview (taken June 2, 2021), filed November 29, 2021 (Doc. 82)).

## PROCEDURAL BACKGROUND

Law enforcement officers arrested DeVargas on June 2, 2021.  See Arrest Warrant Returned Executed, filed June 4, 2021 (Doc. 11).  On October 26, 2021, a federal Grand Jury

charged DeVargas with: (i) Count 1, being a felon in possession of a firearm on April 10, 2021, in violation of 18 U.S.C. §§ 922(g)(1) and 924; and (ii) Count 2, being a felon in possession of a firearm on June 2, 2021, in violation of 18 U.S.C. §§ 922(g)(1) and 924. See Indictment at 1. The Indictment lists DeVargas' two previous felony convictions: (i) second-degree murder; and (ii) aggravated fleeing a law enforcement officer. See Indictment at 1. DeVargas filed his Second MTS on November 10, 2021. See Second MTS at 1. DeVargas filed his Third MTS on November 9, 2021. See Third MTS at 1.

      1.    **Second MTS.**

DeVargas contends that the Court should suppress evidence of the Springfield Rifle found at his home during the Search Warrant's execution, because probable cause does not support the Search Warrant Application. See Second MTS at 11. DeVargas argues that the Search Warrant Application lacks probable cause, because "the warrant affidavit doesn't allege that anything criminal ever happens in Mr. DeVargas' home, that any specific type of criminally relevant evidence might likely be there, or say much of anything at all about the premises other than that Mr. DeVargas lives there." Second MTS at 11-12. Moreover, DeVargas notes that, as to DeVargas, the Search Warrant Application relies on information from CHS-4, and, while the Search Warrant Application asserts that CHS-4 is reliable, it does not provide any factual basis for that conclusion. See Second MTS at 12. DeVargas contends that, even taking CHS-4's information that DeVargas acts as a lookout for BTL members as true, this information does not support a reasonable belief that there is evidence of the BTL conspiracy in his home. See Second MTS at 12. Further, DeVargas contends that, while the Search Warrant Application may have compelling allegations with regard to the other BTL conspiracy members, the facts specifically relating to DeVargas are weak and do not demonstrate a reasonable belief that DeVargas' home

contains criminal evidence.  See Second MTS at 12-13.  DeVargas argues that, because a specific factual basis with respect to DeVargas does not support the Search Warrant Application, executing officers did not rely in good faith on the Search Warrant.  See Second MTS at 13-14.

       **2.**      **United States' Second MTS Response.**

       The United States responds to the Second MTS.  See United States' Response in Opposition to Defendant's Second Motion to Suppress Evidence (Doc. 74), filed December 8, 2021 (Doc. 94)("Second MTS Response").  The United States makes three primary arguments. See Second MTS Response at 1.  First, the United States contends that the Search Warrant Application articulates probable cause that officers would find firearms, drug-trafficking, and gang affiliation evidence at DeVargas' home.  See Second MTS Response at 1.  Second, the United States asserts that the agents who executed the search warrant acted with an objective, good-faith belief that the warrant was proper and urges the Court to apply the good-faith exception.  See Second MTS Response at 1.  Third, the United States argues that the evidence discovered pursuant to the search warrant would have been discovered inevitably.  See Second MTS Response at 1.

       Regarding its first argument, the United States asserts that the search warrant articulates probable cause and argues that DeVargas' arguments do not consider the totality of the search warrant's circumstances.  See Second MTS Response at 6.  The United States notes that, when a Court determines whether a search warrant articulates probable cause, it should "'determine whether there is substantial evidence in the record supporting the magistrate's decision to issue a warrant.'"  Second MTS Response at 6 (quoting Massachusetts v. Upton, 466 U.S. 727, 728 (1984).  Moreover, the United States notes that the Court should grant deference to Magistrate Judge Fashing's finding that probable cause exists, unless there is no substantial basis for so concluding.  See Second MTS Response at 7.  The United States further argues that, when

considering whether substantial evidence supports the probable cause finding, the Court must look to the totality of the search warrant's circumstances and must not consider any single element in isolation.  <u>See</u> Second MTS Response at 7.  The United States contends first that probable cause supports the search warrant for DeVargas' home, because a reliable confidential informant, CHS-4, provided reliable information that criminal activity may have occurred at DeVargas' home.  <u>See</u> Second MTS Response at 9-10.  The United States argues that the search warrant states that CHS-4 has a history of providing reliable information to the FBI, that CHS-4's information is reliable, because by other evidence discovered in the investigation of BTL members corroborates what CHS-4 told the FBI, and that CHS-4 is DeVargas' "close associate."  Second MTS Response at 9-10.  The United States asserts that information solely from a CI can support probable cause, but that the search warrant at issue here also includes more specific information, such as that

> the information provided by CHS-4 about Defendant's conduct on April 10, 2021 matched with the facts of Defendant's arrest. CHS-4 noted that Defendant did not immediately submit to law enforcement on this date, but instead attempted to lure them away from a BTL drug house. This information is consistent with Defendant's conduct of attempting to flee from law enforcement when he was encountered.

Second MTS Response at 10.  The United States further argues that the search warrant establishes a sufficient nexus between DeVargas and his home.  <u>See</u> Second MTS Response at 11.  The United States contends that it is sufficient for an affiant officer to attest, based on his or her experience, that officers are likely to find evidence at a defendant's home.  <u>See</u> Second MTS Response at 11 (citing <u>United States v. Biglow</u>, 562 F.3d 1272, 1280 (10th Cir. 2009)).  The United States asserts that the search warrant's affiant "noted extensive training and professional experience informing the affiant's knowledge that drug traffickers, gang members, and their associates keep drugs and firearms in their residences, businesses, and cars."  Second MTS Response at 12.  The United States also notes that the affiant officer states in the search warrant application that DeVargas is a

convicted felon who was "charged recently with unlawfully possessing a firearm, after attempting to flee from law enforcement." Second MTS Response at 12. The United States argues that DeVargas' reliance on United States v. Gonzales, 399 F.3d 1225 (10th Cir. 2005), is inapposite, because, in that case, the affiant officer did not link the residence to be searched to the defendant. See Second MTS Response at 13.

Next, the United States argues that, even if the search warrant affidavit lacks probable cause, the executing officers relied on the search warrant in good faith. See Second MTS Response at 14. The United States argues that the search warrant affidavit demonstrates probable cause on its face, and, even if probable cause does not support the search warrant affidavit, the affidavit is not so devoid of probable cause to render an officer's reliance on it unreasonable. See Second MTS Response at 17. The United States argues: "The affidavit provides a nexus, based on the affiant's training and experience, between gun, drug, and gang evidence and residences," Second MTS Response at 17, which is the minimum that the Fourth Amendment to the Constitution of the United States of America, U.S. Const. amend. IV, requires, see Second MTS Response at 17 (citing United States v. Gonzales, 399 at 1231).

Finally, the United States argues that officers would have discovered inevitably the evidence uncovered pursuant to the search warrant. See Second MTS Response at 18. The United States argues that the evidence would have been discovered inevitably, because officers had a valid arrest warrant for DeVargas. See Second MTS Response at 18. The United States contends that the arrest warrant permitted officers to enter DeVargas' home if they had reason to believe DeVargas was inside. See Second MTS Response at 18 (citing Payton v. New York, 445 U.S. 573, 603 (1980)). The United States attests that the officers would have executed the arrest warrant while DeVargas was inside his home, and, in executing the arrest warrant, would have seen the

firearms inside his home.  See Second MTS Response at 18.  Further, the United States argues

that, even if the officers did not enter DeVargas' home, "the firearm was plainly visible from

outside the front door of Defendant's residence."  Second MTS Response at 19.  Consequently,

the United States asks the Court to deny DeVargas' Second MTS.  See Second MTS Response at

20.

       **3.**       **Second MTS Reply.**

DeVargas replies to the United States' Second MTS Response.  See Defendant's Reply in

Support of His Second Motion to Suppress, filed December 27, 2021 (Doc. 112)("Second MTS

Reply").  In his Second MTS Reply, DeVargas reiterates that the Court should suppress the firearm

evidence, because the search warrant was wholly devoid of probable cause.  See Second MTS

Reply at 1.  DeVargas contends that the search warrant affidavit is insufficient as to DeVargas,

because it includes

> only two particularized allegations against Mr. DeVargas: 1) that he was a known
> associate or member of the Brew Town Locos; and 2) that the government received
> information that Mr. DeVargas was drawing law enforcement away from a stash
> house when he was arrested in a location miles from his home months prior to the
> request for the search warrant.

Second MTS Reply at 2.  DeVargas argues that the warrant contains only general statements that,

based on the affiant officer's experience, gang members and drug traffickers often keep firearms

in their home.  See Second MTS Reply at 2.  DeVargas concedes that the search warrant affidavit

has particular allegations with a close nexus between criminal activity and the locations which

officers would search as to other BTL members but argues that the search warrant affidavit does

not contain the same level of specificity tying DeVargas' residence to criminal activity.  See

Second MTS Reply at 2-3.  DeVargas argues that the only specificity that the affidavit contains

about him is that he lived at the home in which the affidavit states he lived, but that the affidavit

does not contain any information regarding surveillance of this area, information that drug trafficking occurred at his home, information that officers observed drug purchases, or any other allegations that criminal activity occurred at DeVargas' home.  See Second MTS Reply at 3.

DeVargas also asserts that the good-faith exception to the exclusionary rule does not apply here, because the search warrant affidavit is devoid of factual support.  See Second MTS Reply at 3.  DeVargas contends that listing his address, describing the home, and making general statements about criminal activity is insufficient to create a nexus between criminal activity and the place to be searched.  See Second MTS Reply at 3-4 (citing United States v. Gonzales, 399 F.3d at 1230)).  DeVargas contends that, at most, the search warrant affidavit establishes that DeVargas is a person who is associated with the BTL gang, who potentially drew an officer away from a drug house a few months before officers sought the search warrant at issue here.  See Second MTS Reply at 4.  DeVargas argues that any reasonable officer would realize that the search warrant is wholly lacking specificity as to DeVargas and that, therefore, the Court should not apply the good-faith exception. See Second MTS Reply at 4.

Further, DeVargas contends that the officers would not have discovered inevitably the rifle. See Second MTS Reply at 4.  DeVargas argues that, for officers to have plainly seen the rifle, officers would have needed to "break through a locked gate, go up an enclosed ramp and porch, and then enter the front doorway of Mr. DeVargas' residence to take a picture into his bedroom." Second MTS Reply at 5.  Moreover, DeVargas contends that, "because the search warrant and arrest warrant were so inextricably intertwined and in fact executed together, the fact that an arrest warrant exists is not sufficiently independent to allow for the application of the inevitable discovery doctrine."  Second MTS Reply at 5.

Finally, DeVargas argues that the plain-view doctrine does not apply here, because "it is not immediately apparent from the viewpoint of the doorway that the object beside the bed even is a rifle without entering into the home."  Second MTS Reply at 6.  DeVargas further attests that it is not apparent immediately that the firearm is one that DeVargas could not possess.  See Second MTS Reply at 6.  Consequently, DeVargas asks the Court to suppress the firearm evidence.  See Second MTS Reply at 8.

**4.     Third MTS.**

In the Third MTS, DeVargas asks the Court to suppress an interview with officers following his June 2, 2021, arrest, and specifically requests that the Court suppress several inculpatory statements that he made:

> 1) firearms found inside of his residence belonged to him; 2) the statement that he was at that time prohibited from possessing firearms because he was out on bond; 3) that he had the firearms for quite a while; 4) that he purchased one of the firearms in January; 5) that he had the rifle for a while; 6) that he ran the guns on "hotguns" to determine whether the guns were stolen before he bought them; 7) that all the serial numbers on the firearms are visible; and 8) that he is a convicted felon.

Third MTS at 2.  DeVargas argues that the Court should suppress evidence of the interview, because the arresting officers violated DeVargas' rights pursuant to Miranda.  See Third MTS at 3.  DeVargas contends that officers violated his Miranda rights by continuing to question him after he asserted his right to counsel.  See Third MTS at 3.

First, DeVargas contends that Miranda applies to his arrest and that he was undergoing a custodial interview when he asserted his right to counsel, because he was "being apprehended and arrested according to an arrest warrant issued by this court when he was questioned by the Task Force Officer."  Third MTS at 4 (citing United States v. Landry, 345 F. Supp. 2d 118, 123 (D. Mass. 2004)(Lindsay, J.)).  DeVargas also argues that he was in custody, because he was

handcuffed during the interview.  See Third MTS at 4.  Second, DeVargas contends that he asserted

his right to counsel during the interview.  See Third MTS at 4.  DeVargas asserts that he informed

officers twice that "he had 'an attorney on this case.'"  Third MTS at 4 (no citation for quotation).

DeVargas further contends that such assertions meet the minimum threshold of Miranda and

contends: "'[W]hen an accused has invoked his right to have counsel present during custodial

interrogation, a valid waiver of that right cannot be established by showing only that he responded

to further police-initiated custodial interrogation even if he has been advised of his rights.'"  Third

MTS at 4 (quoting Edwards v. Arizona, 451 U.S. 477, 484 (1981)(alteration in Third MTS, but

not in Edwards v. Arizona)).  DeVargas argues that his "two statements that he had 'an attorney

on this case,' are more than sufficient to find that a reasonable officer under those circumstances

would understand his statement to be a request for counsel."  Third MTS at 6 (no citation for

quotation).  After DeVargas asserted his right to counsel, DeVargas contends that officers should

have stopped questioning him.  See Third MTS at 6.

        Third, DeVargas argues that he did not "'voluntarily, knowingly and intelligently'" waive

his right to counsel.  Third MTS at 6 (quoting Smith v. Duckworth, 824 F.3d 1233, 1247 (10th Cir.

2016)(quoting Miranda, 384 U.S. at 444)).  After DeVargas stated that he had an attorney, the

arresting officer responded by telling DeVargas that he had an attorney only on his State case and

that he did not have an attorney on the related federal case.  See Third MTS at 7.  DeVargas

contends: "The fact that Mr. DeVargas believed this statement, even though the Task Force Officer

had no basis for making such a statement, is not only expected but demonstrated the coerciveness

of a federal agent stating to an arrestee that the lawyer they are requesting does not represent them."

Third MTS at 7.  DeVargas contends that the arresting officer should have inquired further about

DeVargas' counsel, and the fact that he did not inquire further establishes that DeVargas did not

knowingly and voluntarily waive his <u>Miranda</u> rights.  <u>See</u> Third MTS at 7.  Consequently, DeVargas asks the Court to suppress the June 2, 2021 interview.  <u>See</u> Third MTS at 7.

     **5.**      **<u>Third MTS Response</u>.**

     The United States responds to the Third MTS.  <u>See</u> United States' Response in Opposition to Defendants' Third Motion to Suppress, filed December 8, 2021 (Doc. 95)("Third MTS Response").  The United States argues that the Court should deny DeVargas' Motion, because DeVargas' "statement about his state defense attorney does not constitute an unequivocal invocation of his right to counsel."  Third MTS Response at 1.  At the outset, the United States notes that it "does not contest Defendant's assertion that he was in custody and interrogated for purposes of the instant motion."  Third MTS Response at 4.  The United States argues only that DeVargas did not assert unequivocally his right to counsel, and that DeVargas' <u>Miranda</u> waiver and the subsequent statements that he made were voluntarily.  <u>See</u> Third MTS Response at 4.

     First, the United States argues that DeVargas waived his right to counsel under the Fifth Amendment to the Constitution of the United States of America, U.S. Const. amend V.  <u>See</u> Third MTS Response at 4.  The United States contends that, when a person asserts their right to counsel, that assertion must be "clear, unequivocal, and unambiguous."  Third MTS Response at 4 (citing <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994)).  The United States argues that DeVargas statement -- "I have an attorney on this case." -- is "an assertion of fact," and is not "a clear and unequivocal request for an attorney in relation to his arrest on the new federal complaint."  Third MTS Response at 5.  The United States contends that DeVargas' statement is ambiguous, and that the reasonable conclusion that would be drawn from this statement is that DeVargas "may or may not" want his counsel present.  Third MTS Response at 5 (emphasis omitted).  The United States contends that DeVargas' argument that the officers should have inquired further to determine what

DeVargas meant when he asserted that he had an attorney in the case is a "tacit concession" that DeVargas' statement is unclear.  Third MTS Response at 6.  Additionally, the United States attests that officers do not have an obligation to clarify ambiguous assertions of the right to counsel.  See Third MTS Response at 6.  Moreover, the United States argues that the officer clarified what DeVargas meant by explaining that his attorney represented him in the State matter and then asking him if that made sense.  See Third MTS Response at 7.  The officer again asked DeVargas if she needed to clarify anything for him, to which DeVargas responded that he knew his rights.  See Third MTS Response at 7.  The officer then asked DeVargas if he was okay with proceeding, to which DeVargas assented.  See Third MTS Response at 7.  Consequently, the United States asserts that DeVargas did not unequivocally, clearly, and unambiguously assert his right to counsel.  See Third MTS Response at 7.

Second, the United States argues that DeVargas' waiver of his Miranda rights and the statements he subsequently made are voluntary.  See Third MTS Response at 7.  At the outset, the United States argues that DeVargas, in his Third MTS, does not engage with many of the factors the Court should consider when analyzing voluntariness and, instead, hinges his entire argument on the officer's statement to DeVargas that his attorney represented him only on the State charges.  See Third MTS Response at 8.  The United States contends that DeVargas' personal characteristics support a voluntariness finding, because nothing in the interview indicates that DeVargas "was unable to understand and exert his own will due to his age, intelligence, or education."  Third MTS Response at 8.  Further, DeVargas had previous interactions with the criminal justice system, which meant he was familiar with his Miranda rights.  See Third MTS Response at 8.  The United States also contends that DeVargas' assertion that he knew his rights indicates that he acted voluntarily.  See Third MTS Response at 9.  Finally, the United States contends that the

interviewing officer was cordial and non-threatening, and never threatened to use physical force. See Third MTS Response at 9-10.  The United States argues, therefore, that DeVargas' statements are voluntary and asks the Court to deny DeVargas' Third MTS.  See Third MTS Response at 10.

6.     **Third MTS Reply.**

DeVargas replies to the United States' Third MTS Response.  See Defendant's Reply in Support of his Third Motion to Suppress, filed December 27, 2021 (Doc. 111)("Third MTS Reply").  In his Third MTS Reply, DeVargas contends that the United States relies only on out-of-Circuit, factually distinguishable precedent.  See Third MTS Reply at 1.  First, DeVargas argues that the United States relies on United States v. Jourdain, Criminal No. 06-313 (01-02) (RHK/RLE), 2007 WL 269827 (D. Minn. Jan. 26, 2007)(Kyle, J.), to contend that DeVargas' statement that he had an attorney is a clear, unequivocal, and unambiguous statement, but that, unlike the defendant in United State v. Jourdain, DeVargas never was asked if he wanted to speak with his attorney when he asserted that he had an attorney.  See Third MTS Reply at 2 (citing United States v. Jourdain, 2007 WL 269827, at *6).  Moreover, according to DeVargas, unlike the defendant in United States v. Jourdain, DeVargas was not read his rights multiple times, he did not have his rights explained to him, and he did not sign a written waiver of his rights.  See Third MTS Reply at 2 (citing United State v. Jourdain, 2007 WL 269827, at *6).  DeVargas also argues that the United States' reliance on Nunez v. Gibson, No. CV 12-04839-AB (DFM), 2018 WL 7501127 (C.D. Cal. Nov. 21, 2018)(McCormick, J.), to argue that DeVargas voluntarily waived his Miranda rights is inapposite, because, in Nunez v. Gibson, the defendant signed a written waiver, a second interview was conducted, after which the defendant spoke with and retained an attorney, and then a third interview was conducted in which the defendant asserted his Miranda rights.  See Third MTS Reply at 2 (citing Nunez v. Gibson, 2018 WL 7501127, at *4).  DeVargas notes that, here,

officers did not give him a chance to call or to consult with an attorney, and the interview occurred in one sitting.  See Third MTS Reply at 3.

> DeVargas acknowledges that
>
> statements such as "maybe I should have an attorney," or "I may want to talk with counsel," or questions along the lines of "Shouldn't I have an attorney present," have regularly been found to be equivocal, [but] Mr. DeVargas' statement in this case clearly put the government on notice that he had an attorney and the clear message of this statement, which was made in the middle of his Miranda warnings, was that he wanted to talk with counsel.

Third MTS Reply at 4 (no citations for quotations).  DeVargas notes that "no magic words" are required for a person to invoke his or her Miranda rights, and asserts that the United States' argument is equivalent to requiring that a defendant say "'I want to talk to an attorney right [now] regarding the questions you are about to ask me.'"  Third MTS Reply at 4 (no citation for quotation).  DeVargas concludes by arguing that, because he "responded to the reading of his right to counsel by stating that he had an attorney on this case, Mr. DeVargas unequivocally invoked his right to counsel and all questioning should have ceased."  Third MTS Reply at 5.  Consequently, DeVargas asks the Court to suppress all statements that he made in the interview.  See Third MTS Reply at 5.

### 7.   The Hearing.

On December 28, 2021, the Court held a hearing on: (i) the United States' Motion in Limine to Exclude Defendant's Self-Serving Statements as Inadmissible Hearsay, filed October 20, 2021 (Doc. 45); (ii) the United States' Motion in Limine to Exclude Evidence of Possible Penalties, filed October 20, 2021 (Doc. 46); (iii) the United States' Motion in Limine to Prohibit Unfounded Allegations of Government Misconduct or Irrelevant Challenges to the Quality of the Government's Investigation, filed October 22, 2021 (Doc. 48); (iv) the United States' Motion in

Limine to Prohibit Discussion of Defense Exhibits Not Previously Provided to the United States,

filed October 22, 2021 (Doc. 49); (v) the United States' Motion in Limine to Prohibit Evidence of

Defendant's Personal Beliefs About the Second Amendment, filed November 5, 2021 (Doc. 62);

(vi) the United States' Motion in Limine Regarding Admission of Defendant's Prior Conviction

Documents, filed November 5, 2021 (Doc. 63); (vii) the Defendant's Motion to Dismiss, filed

November 9, 2021 (Doc. 71); (viii) the Defendant's First Motion to Suppress Evidence, filed

November 9, 2021 (Doc. 72); (ix) the Second MTS; and (x) the Third MTS.  See Clerk's Minutes

at 1, filed December 28, 2021 (Doc. 117).  At the hearing, the Court allowed the parties to argue

on all ten motions.  See Clerk's Minutes at 2-10.  The Court includes only the portions of the

hearing relevant to the Second MTS and the Third MTS here.

      **a.**        **Second MTS.**

First, the Court provided DeVargas with the opportunity to make opening statements on

the Second MTS, and DeVargas declined.  See Tr. at 43:9-25 (Court, Kastrin, Hart).  The United

States called FBI Special Agent Pete Ubbelohde, who provided additional evidence regarding the

United States' inevitable discovery argument.  See Tr. at 44:20-63:25 (Kastrin, Ubbelohde, Court,

Hart).  The Court then allowed DeVargas to argue in support of the Second MTS.  See Tr. at 64:4-

6 (Court, Hart).  Hart asserted that the Second MTS has four primary issues: (i) whether there was

probable cause to issue the search warrant; (ii) whether the good faith exception applies; (iii)

whether the plain view exception applies; and (iv) whether the inevitable discovery exception

applies.  See Tr. at 64:8-19 (Hart).  The Court asked DeVargas if the fact that the search warrant

relies on a CI who states that, when DeVargas was stopped on his bicycle, he was trying to lure

law enforcement away from a BTL drug house is sufficient to support probable cause.  See Tr. at

65:12-24 (Hart, Court).  DeVargas responded that the CI's statement is not sufficient to support

probable cause, because, even if the information is true, the incident occurred two months before the search warrant application and more than four miles away from his home, which the search warrant authorized officers to search.  See Tr. at 66:1-10 (Hart).  DeVargas argued that, despite the search warrant containing extensive evidence about suspicious, gang-related activity, including surveillance of controlled buys, and of confidential human informant statements, the search warrant does not contain any information tying any of these activities to DeVargas' house.  See Tr. at 66:10-25 (Hart).  DeVargas argued that he was "thrown in here as an afterthought or something along those lines as just an additional person, and the lack of probable cause as to Mr. DeVargas seems to be overcome by the fact that it's buried in a rather compelling target as to the other subjects."  Tr. at 67:22-68:2 (Hart).  DeVargas also asserted that the good-faith exception to the exclusionary rule does not apply here, because, even though a United States Magistrate Judge approved the search warrant, law enforcement officers and federal agents still have an obligation to look at a search warrant and determine whether there is probable cause as to an individual.  See Tr. at 69:19-70:6 (Hart).  DeVargas argued that, "if there was probable cause in this case[,] then there is probable cause in every single case," because the United States always could find an officer to say "in my experience evidence of criminality and crimes is found in homes," and secure a search warrant.  Tr. at 70:6-12 (Hart).

Next, DeVargas contended that the inevitable discovery exception and the plain-view exception do not apply here, because the officers did not have to enter DeVargas' home to effectuate the arrest warrant.  See Tr. at 71:16-22 (Hart).  The Court then asked DeVargas whether the standard is objective, and whether it matters that the officer who testified was not the officer who actually performed the search, when he testified that officers would have entered DeVargas' home or seen the firearm when executing the arrest warrant.  See Tr. at 72:18-6 (Court).  DeVargas

agreed that the officers who performed the search need not testify to satisfy the standard, but noted that his argument focuses on the fact that the photographs taken at the scene demonstrate that the rifle was not in plain view from the door.  See Tr. at 73:24-74:2 (Hart).  DeVargas argued that, from the doorway, it is not clear objectively that the item present in DeVargas' bedroom is a rifle, or that officers lawfully could have entered the bedroom's doorway to determine that it is a rifle, because they could not do so under just the arrest warrant.  See Tr. at 75:1-22 (Hart).  DeVargas also asserted that it is not necessary for officers to enter the home to effectuate the arrest warrant, because DeVargas exited the home, walked down the steps, and complied with officers' orders, so the officers did not need to enter his home to effectuate the arrest warrant.  See Tr. at 76: 3-9 (Hart).

The Court then gave the United States an opportunity to respond to DeVargas' arguments, and started by asking the United States for "a sentence in the warrant that is the strongest [indication] that you can find of criminal activity in the house."  Tr. at 78:6-8 (Court).  The United States stated that it believes that the sentence that refers to a reliable, confidential human source saying that DeVargas worked for the BTL to protect a drug stash house the night that he was arrested with a gun is the strongest support for there being criminal activity in DeVargas' house.  See Tr. at 78:14-25 (Kastrin).   When the Court asked how that sentence relates to DeVargas' house, the United States responded that it is enough that an officer states that, based on their training and experience people who work for and protect gangs carry guns and keep them in their homes, and that DeVargas was found with a gun.  See Tr. at 79:2-9 (Court, Kastrin); id. at 79:21-25 (Kastrin).  The United States emphasized that, in the United States Court of Appeals for the Tenth Circuit, probable cause can be based solely on information from reliable and credible informants, and that Magistrate Judges "may rely on the opinion of law enforcement officers as to where contraband or other evidence may be kept."  Tr. at 84:22-24 (Kastrin).  Additionally, the

United States noted that the Magistrate Judge who approved the warrant was aware of the pending felon-in-possession charges against DeVargas.  See Tr. at 85:4-5 (Kastrin).  Moreover, the United States argued that, even if the Court were to find that probable cause does not support the search warrant, the question is close enough that the United States clearly meets its burden under the good-faith exception.  See Tr. at 85:8-16 (Kastrin).  Finally, the United States asserted that the firearm would have been discovered inevitably, that Ubbelohde testified that he approached the house's threshold, and that he gave "confident testimony" that "he or somebody else would have gone at the very least to the threshold of the door even without entering and that they could see the firearm from there."  Tr. at 86:3-6 (Kastrin).  The United States also contended that, even if the officers did not have the search warrant, the officers would have entered the house's threshold while arresting DeVargas to "hear if there is anybody else who is laying in wait just to get a better sense of the security of the scene" and to "document damage or lack thereof to protect against any claims against the FBI," and that the officers would have entered the threshold when DeVargas allowed them to put his dog inside the house or when they retrieved a shirt for DeVargas.  See Tr. at 88:20-22 (Kastrin).  The Court then noted that it was inclined to deny the Second MTS, because the issue whether the warrant had probable cause is at least a close enough issue that the officers relied on the search warrant in good faith, and that the officers inevitably would have discovered the firearm.  See Tr. at 94:5-20 (Court).

   **b.**      **Third MTS.**

       The Court gave DeVargas an opportunity to argue in support of his Third MTS.  See Tr. at 132:1-5 (Court).  First, DeVargas noted that his Third MTS is a pure legal argument based on whether DeVargas made a clear, unequivocal statement that he wants to speak to an attorney, at which point the officers should have stopped questioning him.  See Tr. at 132:6-25 (Hart).

DeVargas emphasized that DeVargas made a "clear enough unequivocal statement at that part of the warnings where questioning should have [ceased] and he should have been given access to a lawyer," Tr. at 132:16-133:2 (Hart), and noted that, on the Third MTS, he was not arguing that there are any factual disputes, see Tr. at 133:4-6 (Hart).

The Court then gave the United States a chance to respond to the Third MTS.  See Tr. at 133:7-8 (Court).  The United States started by noting that it agrees that "the issue is whether or not the Court finds that the statement of fact [--] and an actual misstatement [--] but the statement of fact [']I have a lawyer on this case['] is a clear and unequivocal invocation of the right to have counsel present prior to questioning."  Tr. at 133:11-16 (Kastrin)(no citation for quotation).  The United States argued, however, that officers asked DeVargas if he wanted the lawyer on his State case to be present, and that DeVargas did not say clearly yes, which means that DeVargas' statement is ambiguous.  See Tr. at 133:17-134:4 (Kastrin).  The United States also argued that "there is no requirement that when faced with an ambiguous statement about counsel that the law enforcement officers engage in an inquiry to resolve the ambigu[ity]."  Tr. at 134:9-14 (Kastrin).  The United States continued, stating that "this just comes down to the simple fact that stating [']I have a lawyer['] is not the same as saying [']I have a lawyer and I want that lawyer present here today.[']"  Tr. at 134:23-25 (Kastrin)(no citation for quotation).   DeVargas responded to the United States' argument by arguing that what makes DeVargas' case different from the cases which the United States cites is that "Mr. DeVargas makes the statement [']I have an attorney on this case['] immediately after the instruction of you have the right to have an attorney present during questioning," Tr. at 135:19-22 (Hart), and that immediacy makes his assertion unambiguous, see Tr. at 135:23 (Hart).   The Court then indicated that it was inclined to deny the Third MTS.  See Tr. at 139:4-5 (Court).

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

1.    **Reasonable Government Searches**.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).   See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121.  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it

is needed for the promotion of legitimate governmental interests'" (quoting United States v.

Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the
> constitutionality of a governmental search is "reasonableness."   At least in a
> case . . . where there was no clear practice, either approving or disapproving the
> type of search at issue, at the time the constitutional provision was enacted, whether
> a particular search meets the reasonableness standard "'is judged by balancing its
> intrusion on the individual's Fourth Amendment interests against its promotion of
> legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor

Executives' Ass'n, 489 U.S. 602, 617 (1989)).   The Supreme Court has held that the test of

reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of
> precise definition or mechanical application.   In each case [determining
> reasonableness] requires a balancing of the need for the particular search against
> the invasion of personal rights that the search entails.   Courts must consider the
> scope of the particular intrusion, the manner in which it is conducted, the
> justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the

individual's privacy expectations.   See, e.g., United States v. Knights, 534 U.S. at 119-20 (noting

that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because

a condition of his probation was to consent to search of his apartment without notice or probable

cause, and because he was clearly notified and informed of the provision); Banks v. United States,

490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited

expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the

fourth amendment for a person on conditional release, or a felon, may be unreasonable for the

general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining

and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure

implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light

of an inmate's diminished privacy rights . . . .").

As Justice Kagan has noted, property law informs society's expectations about what

government intrusions are reasonable: "It is not surprising that in a case involving a search of a

home, property concepts and privacy concepts should so align.  The law of property 'naturally

enough influence[s]' our 'shared social expectations' of what places should be free from

governmental incursions."   Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J.,

concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch.

Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate

varies, of course, with context, depending, for example, upon whether the individual asserting the

privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations

omitted).

### 2.    **Traffic Stops.**

A traffic stop is an investigative detention, see United States v. Toro-Pelaez, 107 F.3d 819,

823 (10th Cir. 1997), and is thus analyzed according to the principles that the Supreme Court set

forth in Terry v. Ohio, 392 U.S. 1 (1968)("Terry"), see United States v. Kitchell, 653 F.3d 1206,

1216 (10th Cir. 2011)(concluding that a traffic stop is a Terry stop); United States v. Leon-Quijada,

107 F.3d 786, 792 (10th Cir. 1997).  In Terry, the Supreme Court authorized police officers to

conduct limited seizures and to search a person's outer clothing when the officer has reasonable

suspicion that criminal activity may be afoot.  See Terry, 392 U.S. at 30-31.  The Tenth Circuit

has concluded that traffic stops fall into the category of Terry stops.  See United States v. Toro-

Pelaez, 107 F.3d at 823-24 ("A traffic stop is a seizure within the meaning of the Fourth

Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause."); United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *10 (D.N.M. Feb. 19, 2010)(Browning, J.); United States v. Hanrahan, No. CR 04-1978 JB, 2005 WL 2312746, at *4 (D.N.M. Aug. 12, 2005)(Browning, J.), aff'd, 508 F.3d 962 (10th Cir. 2007).

For officers to lawfully stop a vehicle, they must have "a particularized and objective basis for suspecting the particular persons stopped of criminal activity." United States v. Leos-Quijada, 107 F.3d at 792 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Police officers may stop a vehicle only when they have "a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity." United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995)(citing United States v. Nicholson, 983 F.2d 983, 987 (10th Cir. 1993)). Accord United States v. Ramos, 194 F. Supp. 3d at 1156. Reasonable suspicion is not determined by any one factor but by the totality of the circumstances that the officer knew. See United States v. Ceballos, 355 F. App'x 226, 229 (10th Cir. 2009)(unpublished)[5]; United State v. Elkins, 70 F.3d at 83 (citing

_____

[5]United States v. Ceballos is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Ceballos, United States v. King, 209 F. App'x 760 (10th Cir. 2006), United States v. Reed, 195 F. App'x 815 (10th Cir. 2006), United States v. Maraga, 76 F. App'x 223, 228 (10th Cir. 2003), United States v. Moraga, 76 F. App'x 223, 228 (10th Cir. 2003), Molina v. Spanos, 208 F.3d 226, 1999 WL 626126 (10th Cir. 1999)(unpublished table decision), United States v.

Alabama v. White, 496 U.S. 325, 330 (1990)).  Even if the officer does not form subjective

reasonable suspicion, if the circumstances of which he is aware would lead an officer to develop

reasonable suspicion, the stop is proper.  See United States v. Ceballos, 355 F. App'x at 229

(holding that an officer's "subjective characterization of his actions is irrelevant").

If a police officer observes a traffic violation, the officer has cause to execute a traffic stop.

See Whren v. United States, 517 U.S. 806, 809-10 (1996)("As a general matter, the decision to

stop an automobile is reasonable where the police have probable cause to believe that a traffic

violation has occurred."); United States v. Ramstad, 308 F.3d 1139, 1144 & n. 1 (10th Cir.

2002)(acknowledging that Whren v. United States "indicate[s] that probable cause is a *sufficient*

ground for a stop," but explaining that reasonable suspicion is all that is necessary (quoting United

States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001)(emphasis in United States v. Ramstad

and United States v. Callarman).  Even if the officer has an ulterior motive for executing the traffic

stop -- i.e., to investigate some other suspected illegal conduct -- the officer can lawfully stop a

vehicle that he or she observes violating the traffic laws.  See Whren v. United States, 517 U.S. at

813-14; United States v. King, 209 F. App'x 760, 762 (10th Cir. 2006)(unpublished)("The

constitutional reasonableness of a traffic stop does not depend on the actual motivations of the

officer involved.")(citing Whren v. United States, 517 U.S. at 813).  In other words, there is no

constitutional prohibition on what are colloquially referred to as "pretext stops," so long as the

---

Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013), aff'd, 597 F. App'x 991 (10th Cir. 2015), Appleby v. Cline, 711 F. App'x 459, 464 (10th Cir. 2017), United States v. Sierra-Estrada, 248 F. App'x 973, 981 (10th Cir. 2007), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

officer also has a constitutional basis for executing the stop.  United States v. Sedillo, 2010 WL 965743, at *10.

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015).  See Knowles v. Iowa, 525 U.S. 113, 117 (1998)(observing that the investigation into the traffic offense is "a relatively brief encounter" that is "more analogous to a so-called 'Terry stop' . . . than to a formal arrest")(quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984)).  The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop, . . . and attend to related safety concerns." Rodriguez v. United States, 575 U.S. at 354. Because the officer's purpose is to address the traffic infraction, the stop may last no longer than is necessary to effectuate that purpose.  See Illinois v. Caballes, 543 U.S. 405, 407 (2005).  The authority for the seizure therefore ends when the officer completes -- "or reasonably should have [] completed" -- the tasks tied to the traffic infraction.  Rodriguez v. United States, 1575 U.S. at 354.  See United States v. Hunnicutt, 135 F.3d 1345 (10th Cir. 1998)(observing that the traffic stop must last no longer than necessary to confirm or deny the suspicion that justified the stop -- the traffic offense); United States v. Ramos, 194 F. Supp. 3d at 1157.  In short, absent reasonable suspicion to justify an extended detention, an officer cannot "measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries.  Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)).

Beyond writing the traffic citation, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." Illinois v. Caballes, 543 U.S. at 408.  Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding warrants for the driver exist.  See Delaware v. Prouse, 440 U.S. 648, 658-

60 (1979).  These checks serve the same purpose as the traffic code: to ensure that vehicles on the road are operated safely and responsibly.  See Delaware v. Prouse, 440 U.S. at 658-59; 4 W. LaFave, Search and Seizure § 9.3(c), 507-517 (5th ed. 2012).  Similarly, a VIN inspection confirms that the driver can legally operate this particular vehicle -- because it is not stolen -- on the highway. See New York v. Class, 475 U.S. at 115 (concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop").  The Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations." New York v. Class, 475 U.S. at 119.  See id. at 114 ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile.").  Unlike checking license and insurance, however, checking the VIN located inside of the vehicle's doorjamb requires opening the vehicle's door.  Nonetheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- is subject to a reasonable expectation of privacy. New York v. Class, 475 U.S. at 118.  Checking a vehicle's VIN therefore has a similarly close connection to roadway safety as the ordinary inquiries, so it can fairly be characterized as part of the officer's traffic mission.

Officers may also engage in routine questioning while conducting the traffic stop but "only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. at 327-28).  See Muehler v. Mena, 544 U.S. 93, 101 (2005)(noting that, because unrelated inquiries did not "exten[d] the time [the petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was

required").  Accordingly, an officer may conduct certain unrelated checks during a lawful traffic stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  Rodriguez v. United States, 575 U.S. at 355.

In Rodriguez v. United States, the Supreme Court held that a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation."  575 U.S. at 350-51 (alterations in original)(internal quotation marks and citation omitted).  There, a police officer issued a driver a traffic warning, and returned to the driver and to the passenger all of their documents.  See 575 U.S. at 351-52.  After "the justification for the traffic stop was 'out of the way'" and without permission from the driver, the officer: (i) instructed the driver to turn off the ignition, exit the vehicle, and stand by the patrol car; and (ii) deployed a K-9 to circle the vehicle twice to sniff for drugs.  575 U.S. at 352.  "[S]even or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs."  575 U.S. at 352.  The Supreme Court rejected the United States Court of Appeals for the Eighth Circuit's conclusion that the seven- or eight-minute delay constituted an acceptable "de minimis intrusion on Rodriguez's personal liberty."  575 U.S. at 353.  The Supreme Court concluded that the dog sniff, if performed without reasonable suspicion, measurably extended the detention and noted that the officer's authority to detain the driver "end[ed] when tasks tied to the traffic infraction are -- or reasonably should have been -- completed."  Rodriguez v. United States, 575 U.S. at 354.  See United States v. Sharpe, 470 U.S. 675, 686 (1985)(stating that, in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation")(alterations added).

3.     __Vehicle Searches__.

While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro-Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").  Under the automobile-exception to the warrant requirement, however, a warrant is generally not required.  See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); United States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)(citing California v. Acevedo, 500 U.S. 565, 580 (1991)).  The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle.  See Maryland v. Dyson, 527 U.S. at 466-67 ("[W]here there [is] probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.")(citing United States v. Ross, 456 U.S. 798, 809 (1982))(internal quotes omitted); California v. Carney, 471 U.S. 386, 393-94 (1985).  Thus, as long as the investigating officer has probable cause to believe that the vehicle contains contraband or evidence of criminality, he or she may search the vehicle without a search warrant.  See United States v. Sedillo, 2010 WL 965743, at *11.

4.     __Consensual Searches__.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search and the consent is

"freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that: (i) the government "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).  The inquiry is an objective one.  See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003).  "As long as a reasonable innocent person, as opposed to a person knowingly

carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances. For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary. See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers near a building's exits, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way." United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted). Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." United States v. Drayton, 536 U.S. at 205. Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words. "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal.

Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." United States v. Guerrero, 472 F.3d at 789-90. See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'"). For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent. See 335 F.3d at 1175.

In United States v. Gordon, the suspect moved to suppress all physical evidence an officer seized from a locked duffel bag. See 173 F.3d at 765. The officer then asked to see the suspect's train passenger ticket and identification, inquired into his travel plans, and asked if he had any luggage. See 173 F.3d at 765. The officer did not inform the suspect that he was free to leave or not answer her questions. See 173 F.3d at 765. The officer asked to search the suspect's luggage and the suspect gave his consent. See 173 F.3d at 765. She asked him whether he had any contraband, informing him that contraband was the subject of her search. See 173 F.3d at 765. When the officer encountered the suspect's locked bag, she asked him if he could open it. See 173 F.3d at 765. Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]." 173 F.3d at 766. The Tenth Circuit concluded that the suspect's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag." 173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage. See 173 F.3d at 766. The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include. See United States v.

Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).  The Tenth Circuit determines whether a search

remains within the boundaries of the consent given based on the totality of the circumstances.  See

United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996).  When an officer tells a suspect the

object of his search and the suspect consents to a search for that object within a certain area, the

Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search

of any area within the confines of the officer's request where the object may be found.  United

States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs,

he consented to a search of any area in the motel room where one might hide drugs").  See United

States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not exceed the scope

of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they

found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470

(holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in

searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding

that the removal of "a few screws from the strip holding down the carpet which covered the metal

compartment containing the packages of cocaine" did not exceed the scope of consent to search

the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the

defendant consented to a search of his apartment for another person, he consented to the search of

any area large enough to accommodate that individual).

Notably, if the suspect fails to object to the officer's search, it indicates that "the search

was within the scope of consent."  United States v. Gordon, 173 F.3d at 766.  See United States v.

Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the

suspect gave consent to search the car for weapons, but failed to object when the officer began to

search the glove compartment and discovered narcotics).  Accordingly, in United States v. Gordon,

the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked

bag when the officer discovered it within his larger bags.  173 F.3d at 766 (citing <u>Florida v. Jimeno</u>,

500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search

to which he consents.")).  The Tenth Circuit emphasized: "We consistently and repeatedly have

held a defendant's failure to limit the scope of a general authorization to search, and failure to

object when the search exceeds what he later claims was a more limited consent, is an indication

the search was within the scope of consent."  173 F.3d at 766.

     **5.**     <u>**Probable Cause for Search Warrants**</u>**.**

"The Supreme Court requires that a magistrate judge be provided information sufficient to

determine the existence of probable cause before he or she issues a warrant."  <u>United States v.</u>

<u>Romero</u>, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing <u>Illinois v. Gates</u>, 462

U.S. at 239), <u>aff'd</u>, 749 F.3d 900 (10th Cir. 2014).  Probable cause requires "more than mere

suspicion but less evidence than is necessary to convict."  <u>United States v. Burns</u>, 624 F.2d 95, 99

(10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support

of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search

would uncover contraband or evidence of criminal activity."  <u>United States v. Danhauer</u>, 229 F.3d

1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between suspected

criminal activity and the place to be searched."  <u>United States v. Corral-Corral</u>, 899 F.2d 927, 937

(10th Cir. 1990).  The task of the Magistrate Judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the
> circumstances set forth in the affidavit before him, including the veracity and basis
> of knowledge of persons supplying hearsay information, there is a fair probability
> that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(internal quotation marks omitted)(quoting Illinois v. Gates, 462 U.S. at 238). See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009).  In making his or her determination, the Magistrate Judge "may draw reasonable inferences from the material provided in the warrant application."  United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause . . . ."  United States v. Reed, 195 F. App'x at 822.  The court's duty is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed."  Illinois v. Gates, 462 U.S. at 238-39 (alteration in original)(quoting Jones v. United States, 362 U.S. at 271).  This deference is appropriate to further the Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v. Texas, 378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should begin with the rule 'that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . .'" (quoting United States v. Lefkowitz, 285 U.S. 452, 464 (1932)), abrogated on other grounds by Illinois v. Gates, 462 U.S. 213.  Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall."  United States v. Ventresca, 380 U.S. at 106.

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless."  United States v. Alabi, 943 F. Supp. 2d at 1253-54 (citing United States v. Leon,

468 U.S. 897, 914 (1984)).  "The court should not defer to a magistrate judge's probable-cause

determination where there is no substantial basis for concluding that the affidavit in support of the

warrant established probable cause." United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M.

2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006).  Specifically, the court

should not defer to a Magistrate Judge's "probable cause determination if it is a mere ratification

of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the

totality of the circumstances." United States v. Reed, 195 F. App'x at 822 (citing United States v.

Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462

U.S. at 239).

###### 6.      **Inventory Searches**.

An inventory search undertaken pursuant to impoundment or the authority to impound

"constitutes a well-defined exception to the warrant requirement." Illinois v. Lafayette, 462 U.S.

640, 643 (1983).  See South Dakota v. Opperman, 428 U.S. 364, 372 (1976).  Discussing the

relationship between probable cause and inventory searches in its opinion in United States v.

Griffin, 729 F.2d 475 (7th Cir. 1984), the United States Court of Appeals for the Seventh Circuit

stated:

> In applying the reasonableness standard adopted by the Framers, [the] Court has
> consistently sustained police intrusions into automobiles impounded or otherwise
> in lawful police custody where the process is aimed at securing or protecting the
> car and its contents.  Thus, the justification for an inventory search does not rest on
> probable cause and the absence of a warrant is immaterial to the reasonableness of
> the search.

729 F.2d at 481 (citations omitted)(internal quotation marks omitted)(quoting Illinois v. Lafayette,

462 U.S. at 643).  "The policies behind the warrant requirement are not implicated in an inventory

search." Colorado v. Bertine, 479 U.S. 367, 371 (1987)(citing South Dakota v. Opperman, 428

U.S. at 370 n.5).  Inventory searches developed in response to three needs: (i) the need to protect the owner's property while it remains in police custody; (ii) the need to protect the police against claims or disputes over lost, stolen, or vandalized property; and (iii) the need to protect the police from danger.  See South Dakota v. Opperman, 428 U.S. at 369.  Inventory searches are allowed to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger. See Florida v. Wells, 495 U.S. 1, 2 (1990)(citing South Dakota v. Opperman, 428 U.S. at 369).

A warrantless inventory search is proper when the search is conducted pursuant to standard police procedures for the purpose of protecting the car and its contents.  See United States v. Maraga, 76 F. App'x 223, 228 (10th Cir. 2003)(unpublished)("An impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation."); United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992)("When the police acquire temporary custody of a vehicle, a warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'")(quoting South Dakota v. Opperman, 428 U.S. at 372));.  "The policy or practice governing inventory searches should be designed to produce an inventory."  Florida v. Wells, 495 U.S. at 4 (citing Colorado v. Bertine, 479 U.S. at 376).  "[I]n forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion."  Florida v. Wells, 495 U.S. at 4.  A court can consider an officer's testimony regarding the procedures and the purpose of the search as evidence. See United States v. Lugo, 978 F.2d at 637.  A written policy concerning inventory searches is not necessary; an oral policy is sufficient to meet the standard procedure test that the Tenth Circuit

articulated in United States v. Lugo.  See Molina v. Spanos, 208 F.3d 226, 1999 WL 626126, at *9 (10th Cir. 1999)(unpublished table decision); United States v. Jacquez, 409 F.Supp.2d 1286, 1298 (D.N.M. 2005)(Browning, J.)("Although there may not be a written policy concerning inventory searches, including inventory searches of unlocked containers, an oral policy is sufficient to meet the standard procedure test articulated in United States v. Lugo.").

If an inventory search is conducted pursuant to department policy, to find the inventory search unconstitutional, the officers must have acted out of bad faith, for the sole purpose of investigation.  See Colorado v. Bertine, 479 U.S. at 371 ("[T]here was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation."); United States v. Moraga, 76 F. App'x 223, 228 (10th Cir. 2003)(unpublished)("Inventory searches must be conducted according to standardized procedures, and the police must act in good faith and cannot search for the sole purpose of investigation."). Inventory searches, however, "must not be a ruse for a general rummaging in order to discover incriminating evidence." United States v. Martinez, 512 F.3d 1268, 1274 (10th Cir. 2008)(quoting Florida v. Wells, 495 U.S. at 4)(internal quotation marks omitted).  See United States v. Tueller, 349 F.3d 1239, 1243 (10th Cir. 2003).  If a police officer performs an inventory search of a vehicle before ultimately deciding not to have it towed, a court must determine "whether at the time of the inventory search [the officer] reasonably believed that the car would be towed." United States v. Henderson, 61 F.3d 906, 1995 WL 431397, at *3 (7th Cir. 1995)(before Posner, C.J., Cummings, J., and Ripple, J.)(unpublished table decision).

## LAW REGARDING THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the government will generally be prohibited from using that evidence in a criminal prosecution of that person.  See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999. The Supreme Court has recognized several exceptions to the exclusionary rule.  See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015)(unpublished).

One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 579 U.S. 232, 238 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the

discovery of evidence." Utah v. Strieff, 579 U.S. at 238. To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Brown v. Illinois, 422 U.S. at 603. This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained. Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam). The Supreme Court has previously concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence. Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances." Brown v. Illinois, 422 U.S. at 603-04. The Supreme Court found sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the independent source doctrine. See 468 U.S. at 799-801, 814. There, agents had probable cause to believe that apartment occupants were dealing cocaine. See 468 U.S. at 799-800. They sought a warrant. See 468 U.S. at 799-800. In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep. See 468 U.S. at 800-01. The next evening, they obtained a search warrant. See 468 U.S. at 800-01. The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry." 468 U.S. at 814. The Supreme Court suggested that "the

existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" Utah v. Strieff, 679 U.S. at 240 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 604. See Utah v. Strieff, 579 U.S. at 239 (observing that the third factor is particularly significant). The exclusionary rule exists to deter police misconduct. See Davis v. United States, 564 U.S. 229, 236-37 (2011). The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, 579 U.S. at 241. Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." Utah v. Strieff, 579 U.S. at 241. See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

### 1.    **Good-Faith Exception.**

Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011). To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)). The Supreme Court has explained that "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (second alteration in original)(quoting Herring v. United States, 555 U.S. 135, 143 (2009)).

Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." United States v. Davis, 564 U.S. at 238 (citations and internal quotation marks omitted).

      a.      **Warrants Based on Illegally Obtained Information.**

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception." United States v. Alabi, 943 F. Supp. 2d at 1260. "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260. If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005)(citation omitted). See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."). "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good

faith' if it contains information that he or a fellow officer obtained illegally." <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1260 (quoting <u>United States v. Herrera</u>, 444 F.3d 1238, 1249 (10th Cir. 2006)).

> ### b.    <u>United States v. Leon</u>.

In <u>United States v. Leon</u>, the Supreme Court faced the question whether to apply the good-faith exception when a police officer mistakenly thought probable cause supported a warrant from which he obtained evidence. <u>See</u> 468 U.S. at 905. The Supreme Court noted that excluding this evidence would not deter police misconduct. <u>See</u> 468 U.S. at 918-19. The officer had taken all of the necessary steps to comply with the Fourth Amendment and reasonably thought his warrant, and, thus, his search, was valid. <u>See</u> 468 U.S. at 918-19. The Supreme Court explained that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding the evidence would not have a significantly deterrent effect on judicial conduct. <u>See</u> 468 U.S. at 916-17. The Supreme Court, thus, concluded that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant. <u>See</u> 468 U.S. at 922-23.

"The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant." <u>United States v. Martinez</u>, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.)(citing <u>United States v. Tuter</u>, 240 F.3d 1292, 1300 (10th Cir. 2001); <u>United States v. Danhauer</u>, 229 F.3d at 1007)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be
> ordered . . . only in those unusual cases in which exclusion will further the purposes
> of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . . "Where an
> officer acting with objective good faith obtains a search warrant from a detached
> and neutral magistrate and the executing officers act within its scope, there is
> nothing to deter." *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, the Tenth Circuit has explained that,

"[u]nder *Leon*, we presume good-faith when an officer acts pursuant to a warrant unless one of

'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an
> affidavit containing false information or information that the affiant would have
> known was false if not for his "reckless disregard of the truth."  [United States v.
> Leon, 468 U.S.] at 923 . . . .  Second, the exception does not apply when the
> "issuing magistrate wholly abandon[s her] judicial role." *Id.*  Third, the good-faith
> exception does not apply when the affidavit in support of the warrant is "so lacking
> in indicia of probable cause as to render official belief in its existence entirely
> unreasonable." *Id.* (quotation omitted).  Fourth, the exception does not apply when
> a warrant is so facially deficient that the executing officer could not reasonably
> believe it was valid.  *See id.*

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008).  "If any of these situations

is present, the good-faith exception should not be applied, and the evidence should be excluded."

United States v. Romero, 743 F. Supp. 2d at 1316.

### c.     **Herring v. United States**.

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in

the Dale County, Alabama, warrant database.  See 555 U.S. at 137.  In the search incident to that

arrest, officers found drugs and a gun on Herring's person.  See 555 U.S. at 137.  Herring was then

indicted on federal gun- and drug-possession charges.  See 555 U.S. at 138.  It turned out, however,

that the warrant under which the officers arrested Herring had been recalled, but the database had

not been updated to reflect that recall.  See 555 U.S. at 138.  Asserting that the evidence found

during the search was fruit of an unlawful arrest, Herring sought to suppress it.  See 555 U.S. at

138.  The district court denied Herring's motion to suppress, and the United States Court of

Appeals for the Eleventh Circuit affirmed.  See 555 U.S. at 138.

The Supreme Court affirmed the Eleventh Circuit's affirmation of the district court's denial

of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary

rule.  See 555 U.S. at 140-46.  The Supreme Court agreed with the Eleventh Circuit that, although

the police's failure to update the warrant database to reflect that Herring's warrant was withdrawn

was negligent, it was not reckless or deliberate.  See 555 U.S. at 140.  The Supreme Court reiterated

its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of

probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable

reliance' on the subsequently invalidated search warrant."  Herring v. United States, 555 U.S. at

142 (quoting United States v. Leon, 468 U.S. at 922).  Tracing the history of cases applying and

declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To

trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can

meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the

justice system."  Herring v. United States, 555 U.S. at 144.  The Supreme Court further explained

that "evidence should be suppressed only if it can be said that the law enforcement officer had

knowledge, or may properly be charged with knowledge, that the search was unconstitutional."

Herring v. United States, 555 U.S. at 143 (internal quotation marks omitted)(quoting Illinois v.

Krull, 480 U.S. 340, 348-49 (1987)).  As long as the "police have [not] been shown to be reckless

in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork

for future false arrests," exclusion of evidence is not warranted when the arrest was made on

objectively reasonable reliance on a warrant that had been subsequently recalled.  Herring v. United States, 555 U.S. at 146.

### d.    **Davis v. United States.**

In Davis v. United States, the Supreme Court confronted the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent.  See 564 U.S. at 239.  At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest.  See Arizona v. Gant, 556 U.S. at 341-48.  The Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996).  Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant.  United States v. Davis, 564 U.S. at 239-40.

The Supreme Court determined that the "acknowledged absence of police culpability dooms [the defendant's] claim."  United States v. Davis, 564 U.S. at 240.  The Supreme Court explained that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144).  The Supreme Court stated: "The conduct of the officers here was neither of these things.  The officers who conducted the search did not violate [the defendant's] Fourth

Amendment rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement."  United States v. Davis, 564 U.S. at 240 (quoting and citing Herring v. United States, 555 U.S. at 144).  The Supreme Court concluded that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case."  United States v. Davis, 564 U.S. at 240.

2.      **Inevitable-Discovery Exception.**

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"  United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.  782 F.2d at 152.  Relying on this statement from United States v. Owens, the Court stated in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it."  810 F. Supp. 2d at 1274 (citations and internal quotation marks omitted).  On appeal, however, the Tenth Circuit clarified that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question.  See United States v. Christy, 739 F.3d at 540. The Tenth Circuit explained:

In *Cunningham* and [United States v. Souza, 223 F.3d 1197 (10th Cir. 2000),] we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal." *Cunningham*, 413 F.3d at 1204 n.1.   In Cunningham, police searched the defendant's home after getting his consent. *Id.* at 1202.   The defendant later contested the search, claiming his consent was coerced. *Id.*   We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred. *Id.* at 1205.   In *Souza*, police illegally opened a UPS package that contained drugs.   223 F.3d at 1200, 1202.   We held the evidence admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred. *Id.* at 1206.   Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.

. . . .

Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," [United States v.] *Larsen*, 127 F.3d [984,] 987 [(10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203.   The Tenth Circuit stated that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. The Tenth Circuit adopted four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable

cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)).  Applying the first factor, the Tenth Circuit stated:

> [T]he prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this case.  Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office.  Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

United States v. Souza, 223 F.3d at 1205.  Regarding the second factor, the Tenth Circuit stated:

> [A]t the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong.  The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed.  Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause.

United States v. Souza, 223 F.3d at 1205-06.  The Tenth Circuit noted that a sergeant eventually obtained a search warrant.  See United States v. Souza, 223 F.3d at 1206.  Regarding the third factor, the Tenth Circuit stated that, unlike "*Cabassa*, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued."  United States v. Souza, 223 F.3d at 1206.  The Tenth Circuit did not reach the fourth factor, but concluded that, although it was

> very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convince[d] [it] that [the case before it was] one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway."   782 F.2d at 152-53 (internal quotation marks omitted)(quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)).   The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine.  See United States v. Owens, 782 F.2d at 152-53.   Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit concluded:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine.  First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers.   In fact, such an intrusion would have been a significant invasion of his privacy.  Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable.  The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it.  Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband.  Alternatively, a friend could have returned to claim the closed bag.

782 F.2d at 153.  "United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation."   United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

In <u>United States v. Cunningham</u>, the Tenth Circuit "appl[ied] the inevitable discovery doctrine . . . because [it was] convinced that without Mr. Cunningham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have been discovered." 413 F.3d at 1205. The Tenth Circuit, in addressing the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- stated:

> Here, the officers took substantial steps to obtain a warrant before the contested search occurred. The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes. As a result of their conversation with the [assistant United States attorney], the officers decided that further surveillance on the two homes was necessary before they specifically selected one to search, and they proceeded to conduct that surveillance immediately. The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204. Regarding the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Tenth Circuit stated:

> The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home. Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway. The officers' surveillance had uncovered the following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace. The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

- 60 -

United States v. Cunningham, 413 F.3d at 1204-05.  Regarding the third factor -- whether a warrant

ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit stated: "Moreover, the

officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside

Mr. Cunningham's home."  413 F.3d at 1205.  Regarding the fourth factor -- evidence that the

officers "jumped the gun," because they lacked confidence in their showing of probable cause and

wanted to force the issue by creating a fait accompli -- the Tenth Circuit stated:

> There is also no evidence the officers "jumped the gun" due to a lack of confidence
> about probable cause and out of a desire to force the issue.  [United States v. Souza,
> 223 F.3d] at 1204.  Instead, the record indicates that the search occurred at the time
> it did because of the coincidental arrival of Mrs. Cunningham.  Her presence on the
> scene led to a series of events that culminated in her son's release from jail, his
> return home, and his consent to search.  As a result, we are satisfied the government
> has demonstrated that, as in Souza, but for Mrs. Cunningham's arrival at 1179 East
> 76th Terrace on the evening of the search, the officers would have obtained a search
> warrant and the evidence in question would have been found.  Id. at 1205.

United States v. Cunningham, 413 F.3d at 1205 (citations omitted).  The Tenth Circuit, therefore,

applied the inevitable-discovery doctrine.  See 413 F.3d at 1205.

In United States v. Christy, the Court applied the four United States v. Souza factors and

determined that the inevitable-discovery exception applied.  See 810 F. Supp. 2d at 1275-79.

Regarding the first factor -- the extent to which the warrant process had been completed at the time

those seeking the warrant learn of the search -- the Court stated: "The deputies did not take any

steps to obtain a warrant before entering Christy's residence.  The United States concedes that they

did not attempt to obtain a warrant before entering Christy's residence. . . .  This factor thus weighs

against applying the inevitable discovery exception."  810 F. Supp. 2d at 1275 (citations omitted).

As to the second factor -- the strength of the showing of probable cause at the time the search

occurred -- the Court concluded:

The Court finds that Carvo had strong probable cause that Christy committed crimes.  At the time of the search, Carvo believed he had probable cause for the California crime of unlawful sexual intercourse, because Christy and K.Y. exchanged naked pictures through electronic mail transmissions over the internet and then arranged a meeting in the middle of the night for K.Y. to run away with Christy.

. . . .

. . . . Because Carvo knew that K.Y. and Christy were exchanging naked pictures, "the belief that there was a sexual relationship or sexual interest between the two was reasonable."  These circumstances are sufficient to form "a reasonable ground for belief of [Christy's] guilt," for the California crime of unlawful sexual intercourse.  Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the California crime of unlawful sexual intercourse.

Carvo also had strong probable cause for the federal crime of coercion or enticement.  Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.

. . . .

. . . . Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the federal crime of coercion or enticement.  Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1276-78 (brackets in original)(citations to record and

footnote omitted).  Regarding the third factor, -- whether a warrant ultimately was obtained, albeit

after the illegal entry -- the Court held:

The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the

blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy.  *United States v. Cunningham*, 413 F.3d at 1205.  Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation.  Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so.  Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO or from the Albuquerque FBI.  Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information.  Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature."  If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant.  Carvo is cross designated to acquire both state and federal search warrants.  This factor thus weighs in favor of application of the inevitable-discovery doctrine.

United States v. Christy, 810 F. Supp. at 1278-79 (second and third alterations in original)(citations omitted).  As to the fourth factor -- the existence of evidence that the officers jumped the gun, because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Court determined:

> There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue."  *United States v. Cunningham*, 413 F.3d at 1205.  The record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter Christy's residence.  This factor thus weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279.  Consequently, the Court applied the inevitable-discovery doctrine.  See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirmed the Court's decision.  See 739 F.3d at 539-44.

Addressing the United States v. Souza factors, the Tenth Circuit noted that the defendant

challenged the Court's ruling only on factors two and four -- the strength of the probable cause

showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep

the warrant requirement."  United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of

Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)).  Regarding

the second factor -- the strength of the showing of probable cause at the time the unlawful search

occurred -- the Tenth Circuit stated:

> The district court found that Officer Carvo knew that K.Y. was a minor, there was a large age difference between her and Mr. Christy, the two exchanged sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y. Given those factual findings, it is a reasonable inference that a sexual relationship existed between Mr. Christy and K.Y.  Officer Carvo also knew that K.Y. was potentially suicidal, had left her depression medication behind, and ran away from home with Mr. Christy.  Based on that knowledge, Officer Carvo's belief that K.Y. was at risk for sexual victimization and assault was reasonable.  Thus, Officer Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity in violation of California law and coerced or enticed K.Y. to travel across state lines to engage in criminal sexual activity in violation of federal law.  The district court was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542 (citations omitted).  Analyzing the fourth factor --

evidence that the officers jumped the gun because they lacked confidence in their showing of

probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit

explained:

> Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his home due to their lack of confidence about probable cause.  Yet as the district court found, no evidence supports the theory that the deputies forced entry for that reason. Instead, the deputies forced entry because they believed K.Y. was in danger.  Mr. Christy argues that the search was not in fact justified by exigent circumstances and points to the district court's conclusion that it was not.  But that is beside the point. The record fully supports the reasonableness of the deputies' assessment of danger. The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543 (citations omitted).   The Tenth Circuit concluded,

therefore, that the Court properly applied the United States v. Souza factors.   See 739 F.3d at 542.

### LAW REGARDING MIRANDA RIGHTS

Law enforcement officials must give the Miranda warnings to a person subject to

"'custodial interrogation.'"   United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir.

2000)(quoting Miranda, 384 U.S. at 444).   A person is in custody if "'his freedom of action is

curtailed to a degree associated with formal arrest.'"   United States v. Hudson, 210 F.3d at 1190

(quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)).   The court must examine "whether 'a

reasonable [person] in the suspect's position would have understood his situation . . . as the

functional equivalent of formal arrest.'"   United States v. Hudson, 210 F.3d at 1190 (alterations in

original)(quoting Berkemer v. McCarty, 468 U.S. at 442).

### 1.    Custodial Interrogation.

A suspect cannot invoke his Miranda rights anticipatorily; Miranda's protections do not

trigger until the suspect is in a custodial interrogation context.   See McNeil v. Wisconsin, 501 U.S.

171, 182 n.3 (1991).       See also Appleby v. Cline, 711 F. App'x 459, 464 (10th

Cir. 2017)(unpublished); United States v. Cook, 599 F.3d 1208, 1214 (10th Cir. 2010)("[I]n order

to implicate Miranda and Edwards,[6] there must be a custodial interrogation.").   "'By custodial

interrogation, we mean questioning initiated by law enforcement officers after a person has been

taken into custody or otherwise deprived of his freedom of action in any significant way.'"

---

[6]Edwards v. Arizona, 451 U.S. 477 (1981), held that once an individual expresses a desire
for counsel, that individual is "not subject to further interrogation by the authorities until counsel
has been made available to him, unless the accused himself initiates further communication,
exchanges, or conversations with the police."   Edwards v. Arizona, 451 U.S. at 484-85.

Berkemer v. McCarty, 468 U.S. at 428 (quoting Miranda, 384 U.S. at 444).  There are "'[t]wo discrete inquiries . . . essential to the determination'" of custody: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011)(quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)(internal quotation marks, alteration, and footnote omitted by J.D.B. v. North Carolina).  See United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998).  "'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'"  J.D.B. v. North Carolina, 564 U.S. at 270 (quoting Thompson v. Keohane, 516 U.S. at 112 (internal quotation marks, alteration, and footnote omitted in J.D.B. v. North Carolina)).  A suspect's Miranda rights, such as a suspect's right to counsel, may trigger before a law-enforcement officer gives a Miranda warning.  See United States v. Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998).

What amounts to custody, however, is only half of the inquiry.  See United States v. Cash, 733 F.3d 1264, 1277 (10th Cir. 2013)("'The fact that [a defendant is] in custody,' however, 'does not automatically render [an] exchange an interrogation.'"  (alterations in United States v. Cash)(quoting Fox v. Ward, 200 F.3d 1286, 1298 (10th Cir. 2000)).  A suspect in custody may not invoke his Miranda rights if he is not also interrogated.  See Rhode Island v. Innis, 446 U.S. 291, 293, 300 (1980).  Interrogation does not require "express questioning of a defendant while in custody."  Rhode Island v. Innis, 446 U.S. at 298-99.  The Supreme Court explained that Miranda was concerned with more than just questioning, but also the "'interrogation environment,'" which implicated practices that "did not involve express questioning."  Rhode Island v. Innis, 446 U.S. at

299 (quoting <u>Miranda</u>, 384 U.S. at 458).  "For example, one of the practices discussed in *Miranda* was the use of line-ups in which a coached witness would pick the defendant as the perpetrator. This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation."  <u>Rhode Island v. Innis</u>, 446 U.S. at 299 (citing <u>Miranda</u>, 384 U.S. at 453).

> A variation on this theme discussed in *Miranda* was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution.

<u>Rhode Island v. Innis</u>, 446 U.S. at 299 (quoting <u>Miranda</u>, 384 U.S. at 453).  Accordingly, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  <u>Rhode Island v. Innis</u>, 446 U.S. at 301 (quoting <u>Miranda</u>, 384 U.S at 439).  See <u>United States v. Cash</u>, 733 F.3d at 1277 ("[I]nterrogation extends *only* to words or actions that the officers should have known were reasonably likely to elicit an incriminating response."  (emphasis added by <u>United States v. Cash</u>)(quoting <u>Fox v. Ward</u>, 200 F.3d at 1298). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police."  <u>Rhode Island v. Innis</u>, 446 U.S. at 301.  See <u>United States v. Yepa</u>, 862 F.3d 1252, 1257 (10th Cir. 2017).

"[C]onduct 'normally attendant to arrest and custody'" is "not the 'functional equivalent' of interrogation."  <u>Fox v. Ward</u>, 200 F.3d at 1298 (quoting <u>Rhode Island v. Innis</u>, 446 U.S. at 301)(concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their business cards did not constitute interrogation).  The Tenth Circuit has concluded, however, that interrogation "includes those instances where a defendant is in custody and it is clear that

questioning/interrogation is imminent." United States v. Bautista, 145 F.3d at 1147 n.3 (citing United States v. Kelsey, 951 F.2d 1196, 1199 (10th Cir. 1991)("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")). See Connecticut v. Barrett, 479 U.S. 523, 531 (1987)("[C]ustodial interrogation is inherently coercive and . . . a defendant must receive detailed warnings that he or she has the rights to remain silent to receive assistance of counsel before and during questioning."). The Tenth Circuit, however, has since walked back from United States v. Bautista and United States v. Kelsey. In United States v. Cash, a suspect was handcuffed and placed in the back of a squad car after a scuffle with the police, but that did not amount to an interrogation even though questioning was imminent. United States v. Cash, 733 F.3d at 1278-79. Rather, the Tenth Circuit focused its inquiry on specific exchanges between the suspect and officers to determine whether the officer's questions were "'reasonably likely to elicit an incriminating response'" as Rhode Island v. Innis commands. United States v. Cash, 733 F.3d at 1278-79 (quoting Rhode Island v. Innis, 446 U.S. at 301). See United States v. Yepa, 862 F.3d at 1258-61; United States v. Benard, 680 F.3d 1206, 1212 (10th Cir. 2012).

The Court has considered custodial interrogation on several occasions. In United States v. Romero, 743 F. Supp. 2d 1281, the Court applied Rhode Island v. Innis and concluded that a suspect was subjected to interrogation, but was not in custody, so Miranda did not apply. See United States v. Romero, 743 F. Supp. 2d at 1332. The Court determined that a suspect was interrogated, because officers asked the suspect about his whereabouts on a Friday night, and the officer knew that the suspect was the last person to see the victim alive on Friday. See United States v. Romero, 743 F. Supp. 2d at 1332. The Court concluded, however, that the suspect was not in custody, because there was "nothing excessively coercive . . . about the circumstances of

the questioning." 743 F. Supp. 2d at 1334.  The suspect sat in a police vehicle while questioned,

but: (i) he sat in the front seat; (ii) the car's back door was open, suggesting informality; (iii) both

windows were rolled down, also suggesting informality and indicating that the suspect was not in

a non-public questioning room; (iv) there was no prolonged accusatory questioning; (v) the

suspect was not taken to a police station; (vi) law enforcement officers did not display their

weapons; and (vii) the officers never touched the suspect.  See 743 F. Supp. 2d at 1334-35.  See

also United States v. Young, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018)(Browning, J.)(stating

that a defendant in handcuffs was in custody, but that no interrogation occurred when the officer

did not ask the defendant any questions reasonably likely to elicit an incriminating response);

United States v. Begay, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018)(Browning, J.)(concluding

that law enforcement officers interrogated a defendant when they asked him questions, but that the

interrogation was not custodial, because the officers informed the defendant that he was not under

arrest and could stop the interview; because the officers did not engage in accusatory questioning;

and, because, although multiple officers joined the questioning, they separated the defendant from

those individuals who would provide him moral support, and the defendant could see an officer's

firearm, the officers did not physically contact the defendant or suggest that the defendant had to

comply); id. at 1362-63 (concluding that the defendant was not in custody when law enforcement

officers informed him that he did not need to answer their questions; when the officers did not

engage in accusatory, prolonged questioning and asked few questions; when the defendant of his

own volition separated himself from those who could lend moral support; and when the officers

did not physically or orally suggest that the defendant must comply with their requests); United

States v. Fox, No. CR 05-0772 JB, 2006 WL 4017485, at *10-11 (D.N.M. Oct. 29,

2006)(Browning, J.)(explaining that no Fifth Amendment violation occurred where the defendant

was advised of his rights, made the incriminating statements after making his telephone call, admitted that he received no pressure to waive his rights, and was not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(deeming no Fifth Amendment violation where police interviewed the defendant in surroundings familiar to him, informed him of his rights, engaged in no coercive conduct, and gave the defendant a choice to speak with them and sign an advice of rights form).

### 2.    Miranda Waiver.

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently." United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008)(citations omitted). An express statement is not required; the waiver can be inferred from the defendant's actions and words. See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir. 2006)(citing United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997)). "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" United States v. Burson, 531 F.3d at 1256 (quoting Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006)). The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurred. See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11. The Tenth Circuit has noted that this standard incorporates two distinct requirements:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been

waived."

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)).  In determining whether a waiver of rights was knowing and intelligent, the Tenth Circuit employs a totality of the circumstances approach.  See United States v. Burson, 531 F.3d at 1256-57 (citing Colorado v. Spring, 479 U.S. at 573).  "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect."  United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010)(citing Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004); United States v. Minjares-Alvarez, 264 F.3d 980, 985 (10th Cir. 2001)).  A "state of intoxication does not automatically render a statement involuntary."  United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993).  "Rather the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.'"  United States v. Smith, 606 F.3d at 1276-77 (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)("Dickerson")(alterations in United States v. Smith)).

   In United States v. Tafoya, 399 F. Supp. 2d 1227 (D.N.M. 2005)(Browning, J.), the Court considered whether a suspect had knowingly waived his Miranda rights after he was given the warning and responded to the officer's questioning related to the investigation.  See 399 F. Supp. 2d at 1238.  Although the suspect was "emotional" during the questioning, he "gave clear and appropriate answers" to the questions asked of him.  399 F. Supp. 2d at 1238-39.  On those facts, the Court concluded that the suspect had "made voluntary" statements.  399 F. Supp. 2d at 1239.   See United States v. Begay, 310 F. Supp. 3d 1318, 1364-65 (D.N.M.

2018)(Browning, J.)(concluding that the defendant voluntarily waived Miranda rights during an interrogation).

3.    **Requests for an Attorney.**

The Fifth and Fourteenth Amendments to the Constitution of the United States of America provide the accused a "right to have counsel present during custodial interrogation." Edwards v. Arizona, 451 U.S. at 482. In Miranda, the Supreme Court held:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474. The Supreme Court expanded on that principle in Edwards v. Arizona, concluding that, once an individual, subject to custodial interrogation, expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. at 484-85. See Edwards v. Arizona, 451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."); Davis v. United States, 512 U.S. 452, 458 (1994)("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."). The Tenth Circuit has held that Edwards v. Arizona applies -- and a suspect can invoke a right to counsel -- before the officers have issued a Miranda warning. See United States v. Kelsey, 951 F.2d at 1199 ("It is clear from the exchange between Kelsey and the police . . . that the police intended to question Kelsey at some point at his home, and that the police understood

Kelsey to be invoking his right to counsel during questioning.").

This rule amounts to a "second layer" of protection for the accused who has invoked his right to an attorney in that further communication with law enforcement does not mean that he waived his right to an attorney, unless he initiates the conversation.  Maryland v. Shatzer, 559 U.S. 98, 104 (2010).  "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  Maryland v. Shatzer, 559 U.S. at 104 (quoting Edwards v. Arizona, 451 U.S. at 484-85).

> The rationale of *Edwards* is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect.

Maryland v. Shatzer, 559 U.S. at 104-05 (quoting Arizona v. Roberson, 486 U.S. 675, 681 (1988) (Arizona v. Roberson quoting Miranda, 384 U.S. at 467)).  Accordingly, "a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel."  Maryland v. Shatzer, 559 U.S. at 105.  The Supreme Court noted, however, that the "*Edwards* rule is not a constitutional mandate, but judicially prescribed prophylaxis."  Maryland v. Shatzer, 559 U.S. at 105.[7]  A break in custody of fourteen days or more ends the Edwards v. Arizona rule that a subsequent attempt to obtain a Miranda waiver is ineffective when the suspect initially requested counsel.  See Maryland v. Shatzer, 559 U.S. at 110.

---

[7]But see Dickerson v. United States, 530 U.S at 460; infra n.7.

The request for counsel must be clear and unequivocal.  See Davis v. United States, 512 U.S. at 459.  A "suspect need not 'speak with the discrimination of an Oxford don,'" Davis v. United States, 512 U.S. at 459 (quoting Davis v. United States, 512 U.S. at 476 (Souter, J., concurring)), but "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" Davis v. United States, 512 U.S. at 459 (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)).  The applicability of the rule that law enforcement cease custodial interrogation upon a clear request for counsel "requires courts to determine whether the accused actually invoked his right to counsel."  Davis v. United States, 512 U.S. at 453.  An individual's "ambiguous" or "equivocal" references to an attorney, regarding which "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning. Davis v. United States, 512 U.S. at 453 (emphasis in original).  The Supreme Court later explained: "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'"  Berghuis v. Thompkins, 560 U.S. 370, 382 (2010)(quoting Davis v. United States, 512 U.S. at 461).  "Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity."  Berghuis v. Thompkins, 560 U.S. at 382.

The Supreme Court held in Davis v. United States that a defendant's statement to law enforcement agents that "[m]aybe I should talk to a lawyer" was not a clear and unequivocal request for counsel.  512 U.S. at 462.  See Maryland v. Shatzer, 559 U.S. at 112 (noting that a defendant's statement that "'he would not talk about this case without having an attorney present'"

satisfactorily invoked the defendant's right to an attorney (quoting Shatzer v. State, 405 Md. 585, 589, 954 A.2d 1118, 1120 (Md. 2008))); United States v. Zamora, 222 F.3d 756, 765 (10th Cir. 2000)(holding that Zamora's statement "'I might want to talk to my attorney'" is ambiguous and does not invoke the right to counsel)(quoting the agent's testimony at the suppression hearing about Zamora's statements).  In United States v. Santistevan, 701 F.3d 1289 (10th Cir. 2012), the Tenth Circuit held that a letter a defendant handed to a law-enforcement agent, which read "Mr. Santistevan does not wish to speak with you without counsel" is "an unambiguous invocation of the right to counsel."  United States v. Santistevan, 701 F.3d at 1292-93.  Although the defendant agreed to speak with law enforcement without his attorney present almost immediately after handing over the letter, the Tenth Circuit determined that, "once the suspect unambiguously invokes the right to counsel -- as Mr. Santistevan did here by giving the letter to the agent -- all questioning must stop."  United States v. Santistevan, 701 F.3d at 1293.  In United States v. Lux, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant did not make an unambiguous request for counsel when she asked how long it would take if she wanted a lawyer and whether she would have to stay in jail while she waited for a lawyer.  United States v. Lux, 905 F.2d at 1381.  See Valdez v. Ward, 219 F.3d 1222, 1232-33 (10th Cir. 2000)(holding that a non-native English speaker's statement, in response to whether he understood his Miranda rights, that "Yes, I understand it a little bit and I sign it because I understand it [sic] something about a lawyer and he want [sic] to ask me questions and that's what I'm looking for [sic] a lawyer" is an ambiguous request for counsel); Mitchell v. Gibson, 262 F.3d 1036, 1056 (10th Cir. 2001)("Even construed most favorably to Mr. Mitchell, his statement asking police whether he needed an attorney is not, in light of the circumstances, a sufficiently clear request for counsel to require the cessation of questioning under Davis."); United States v. Sierra-Estrada, 248

F. App'x 973, 981 (10th Cir. 2007)(unpublished)(collecting appellate court cases).   The Court has ruled previously that a suspect's question about "whether she needed an attorney" did not constitute a clear and unequivocal request sufficient to invoke a right to counsel.  United States v. Alfaro, No. CR 08-0784 JB, 2008 WL 5992268, at *13 (D.N.M. Dec. 17, 2008)(Browning, J.). See United States v. Martinez, No. CR 02-1055 JB, 2006 WL 4079686, at *12 (D.N.M. Nov. 21, 2006)(Browning, J.)(ruling that "an inquiry whether he might need a lawyer . . . was not an unequivocal assertion of his right to counsel.").

### 4.      Midstream Miranda Warnings.

The Supreme Court first considered midstream Miranda warnings in Oregon v. Elstad, 470 U.S. 298 (1985)("Elstad") -- a home-burglary case.  In Elstad, a witness to the burglary implicated an 18-year-old neighbor -- Michael Elstad -- and, on that information, State of Oregon detectives confronted the teenager in his parents' home.  See Elstad, 470 U.S. at 300.  Without issuing a Miranda warning, detectives briefly questioned Elstad in his parents' living room, and Elstad admitted that he was involved in the burglary.  See Elstad, 470 U.S. at 301.  The detectives then escorted Elstad to the sheriff's headquarters and read him his Miranda rights.  See 470 U.S. at 301. Elstad waived them and gave a full written confession.  See 470 U.S. at 301-02.

On appeal, Elstad argued that his "confession was tainted by the earlier failure of the police to provide Miranda warnings," Elstad, 470 U.S. at 305, and, drawing on the Fourth Amendment's fruit-of-the-poisonous-tree doctrine, see Wong Sun v. United States, 371 U.S. 471 (1963), he contended that the confession "must be excluded," Elstad, 470 U.S. at 305.  The Supreme Court disagreed with Elstad, concluding that "procedural Miranda violation[s] differ[] in significant respects from" Fourth Amendment violations.  Elstad, 470 U.S. at 306 (alterations added).  It explained that, unlike a Fourth Amendment search-and-seizure violation, a Miranda violation does

not necessarily mean that there was a constitutional violation.  See Elstad, 470 U.S. at 306-07.  The

Fifth Amendment prohibits the use of compelled testimony; "[f]ailure to administer *Miranda*

warnings," on the other hand, "creates a presumption of compulsion," but "unwarned statements

that are otherwise voluntary" are nevertheless barred under Miranda.  Elstad, 470 U.S. at 306-07.

Thus, the "*Miranda* exclusionary rule" is prophylactic, and "sweeps more broadly than the Fifth

Amendment itself."  Elstad, 470 U.S. at 307.

That Miranda sweeps more broadly than the Fifth Amendment means that, unlike a Fourth

Amendment violation, a Miranda violation does not necessarily require a confession's exclusion.[8]

---

[8]There is tension in this reasoning and with the Supreme Court's later determination in
Dickerson that Miranda is a constitutional rule.  See Dickerson, 530 U.S. at 437-38, 441.  In
Dickerson, although conceding that "we have repeatedly referred to the *Miranda* warnings as
'prophylactic,' and 'not themselves rights protected by the Constitution,'" Dickerson, 530 U.S. at
437-38 (quoting New York v. Quarles, 467 U.S. 649, 653 (1984); Michigan v. Tucker, 417 U.S.
433, 444 (1974)), the Supreme Court concluded that "*Miranda* is a constitutional decision,"
because (i) it had consistently applied Miranda to state court decisions and (ii) Miranda had invited
legislative action "to protect the constitutional right against coerced self-incrimination,"
Dickerson, 530 U.S. at 438-40.  If Miranda is a constitutional rule, however, it is hard to see how
it can "sweep[] more broadly than the Fifth Amendment itself."  Elstad, 470 U.S. at 306.  It is
possible that the Supreme Court meant that Miranda implicated additional constitutional
amendments, such as the Fourteenth, but the statement's context in Elstad suggests that the
Supreme Court meant that Miranda's exclusionary rule arose from judicial rulemaking, and not
from some other Amendment beyond the Fifth.  See Elstad, 470 U.S. at 305; Elstad, 470 U.S at
307 ("*Miranda's* preventive medicine provides a remedy even to the defendant who has suffered
no identifiable constitutional harm.").  The Supreme Court, in expressly recognizing this tension,
noted that Elstad "does not prove that *Miranda* is a nonconstitutional decision, but simply
recognizes the fact that unreasonable searches under the Fourth Amendment are different from
unwarned interrogation under the Fifth Amendment."  Dickerson, 530 U.S. at 441.  But see
Dickerson, 530 U.S. at 454 (Scalia, J., dissenting)("The proposition that failure to comply with
*Miranda*'s rules does not establish a constitutional violation was central to the *holdings* of
[*Michigan v.*] *Tucker*, [530 U.S. 428 (2000)], [*Oregon v.*] *Hass*, [420 U.S. 714 (1975)], [*New York
v.*] *Quarles*, [467 U.S. 649 (1984)], and *Elstad*.")(emphasis in original)(alterations added).
      Because Elstad's reasoning to exclude fruit-of-the-poisonous-tree evidence rested, in large
part, on Miranda being a nonconstitutional rule, Dickerson's determination that Miranda is a
constitutional rule reopened the question why fruit-of-the-poisonous-tree evidence is not excluded
after a procedurally tainted Miranda warning.  See United States v. Patane, 542 U.S. 630
(2004)("Patane")(plurality op.)("Based on its understanding of *Dickerson*, the Court of Appeals

See 470 U.S. at 307; Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the

---

rejected the post-Dickerson views of the Third and Fourth Circuits that the fruits doctrine does not apply to Miranda violations."). See also Sanchez-Llamas v. Oregon, 548 U.S. at 348 ("We have applied the exclusionary rule primarily to deter constitutional violations.").

The Supreme Court attempted to resolve this tension in Patane, but a divided court did not produce a controlling opinion. See Patane, 542 U.S. at 635-36. The Honorable Antonin G. Scalia, then-Associate Justice of the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, and the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, determined that Miranda was a prophylactic rule, and that admitting "fruits" evidence from a voluntary statement did not implicate the Fifth Amendment's self-incrimination clause. Patane, 542 U.S. at 636. The plurality reasoned that, even taking Dickerson's holding to heart that Miranda is a constitutional rule, there must be a close fit between the constitutional violation and the remedy. See Patane, 542 U.S. at 643. It concluded that admitting nontestimonial fruits of a voluntary statement do not implicate the self-incrimination clause, so there is no fit between the Miranda violation and the exclusionary remedy. See Patane, 542 U.S. at 643 ("The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial."). In so concluding, the three justices in the plurality reaffirmed that Elstad's reasoning was sound. Patane, 542 U.S. at 639-40. The Honorable Sandra Day O'Connor and the Honorable Anthony M. Kennedy, then-Associate Justices of the Supreme Court of the United States, concurred in the judgment and agreed that Elstad is still good law after Dickerson. See Patane, 542 U.S. at 645 (Kennedy, J., concurring). The two Justices did not, however, expressly adopt the constitutional "fit" analysis that the plurality deployed. Patane, 542 U.S. at 645. They concluded that admitting nontestimonial fruits from a voluntary statement "does not run the risk of admitting into trial an accused's coerced incriminating statements against himself." Patane, 542 U.S. at 645 (Kennedy, J., concurring). Instead of concluding that such a remedy would not fit the constitutional violation, however, they concluded that excluding such evidence would not serve the police "deterrence rationale" infusing Miranda. Patane, 542 U.S. at 645 (Kennedy, J., concurring). The concurrence did not comment on Elstad's rationale that Miranda did not justify excluding "fruits" evidence, because, unlike the Fourth Amendment, Miranda is not a constitutional rule.

Elstad's constitutional reasoning, thus, may no longer be good law, but its trustworthiness and deterrence rationales may be. See Elstad, 470 U.S. at 308. Moreover, despite Dickerson's suggestion that "fruits" evidence may need to be excluded as Miranda is a constitutional rule, five justices eschewed that suggestion in Patane. Patane, 542 U.S. at 643, 645. Accordingly, the Court concludes that a procedural Miranda violation does not require the Court to exclude nontestimonal evidence from a voluntary statement based on a fruit-of-the-poisonous-tree theory. See Wong Sun v. United States, 371 U.S. at 471; United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006).

Furthermore, the Court would join the Justices who have noted that Miranda is not properly rooted or found in the Constitution, but instead is the product of the Supreme Court's power to provide prophylactic rules. See Maryland v. Shatzer, 559 U.S. at 106. It may not be a bad rule in that it has -- with its bright-line application -- made a lot of otherwise fuzzy confessions valuable and protected police in their work, but its constitutional and judicial underpinnings are shaky if not non-existent.

exclusionary rule primarily to deter constitutional violations.").  Indeed, the prosecution may still use a confession obtained in violation of Miranda for impeachment purposes.  See Elstad, 470 U.S. at 307.  Moreover, the Supreme Court reasoned that categorically barring a confession after a midstream Miranda warning "undercuts the twin rationales" of the prophylactic Miranda rule -- trustworthiness and deterrence.  Elstad, 470 U.S. at 308.  See Dickerson, 530 U.S. at 433 ("The roots of this test developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy.").

> "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt . . . but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given to it; and therefore it is rejected."

Dickerson, 530 U.S. at 433 (quoting King v. Warickshall, 1 Leach 262, 263-64, 168 Eng. Rep. 234, 235 (K.B. 1783)).  If the post-Miranda confession is otherwise knowing and voluntary, its trustworthiness is not in doubt.  See Elstad, 470 U.S. at 308.  The deterrence rationale likewise loses force when the officers acted in good faith compliance with Miranda.  See Elstad, 470 U.S. at 308 (citing Michigan v. Tucker, 417 U.S. 433, 447-48 (1974)).  Accordingly, the Supreme Court held that, once the Miranda warning is made, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made."  Elstad, 470 U.S. at 309.  See Elstad, 470 U.S. at 318 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made.  As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.").

Extrapolating from that test, the Supreme Court concluded that Elstad's pre- and post-Miranda confessions were voluntary, and therefore admissible.  See Elstad, 470 U.S. at 314-15.  It

noted that, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." Elstad, 470 U.S. at 310. However, where the initial confession is voluntary, "a break in the stream of events" is not needed for the second confession to be admissible. Elstad, 470 U.S. at 310. Rather, the Miranda warning "serves to cure the condition that rendered the unwarned statement inadmissible." Elstad, 470 U.S. at 311.

In Elstad, the Supreme Court reasoned that the initial confession "took place at midday" in Elstad's living room with his mother "a few steps away," so it was voluntary. Elstad, 470 U.S. at 315. With no additional facts demonstrating that the second confession, post-Miranda was elicited under coercive conditions, the Supreme Court deemed it admissible. See Elstad, 470 U.S. at 314. That Elstad had "'let the cat out of the bag by confessing,'" Elstad, 470 U.S. at 311 (quoting United States v. Bayer, 331 U.S. 532, 540 (1947)), with his first statement in no way created a "presumption of compulsion" for the second statement, Elstad, 470 U.S. at 314. Dissenting justices noted that there may be a "'psychological impact of a *voluntary* disclosure of a guilty secret,'" but such disclosure, as a matter of law, does not qualify "'as state compulsion' nor 'compromises the voluntariness' of subsequent confessions." Elstad, 470 U.S. at 312 (Brennan, J., dissenting, joined by Marshall, J.)(emphasis in Elstad)(quoting Elstad, 470 U.S. at 312, 326) .

The Supreme Court next considered midstream-Miranda warnings in Missouri v. Seibert, 542 U.S. 600 (2004)("Seibert"), and issued only a plurality opinion. Seibert, 542 U.S. at 603-05.[9]

_____

[9]The Honorable David H. Souter, then-Associate Justice of the Supreme Court, announced the Court's judgment and delivered an opinion joined by the Honorable John Paul Stevens, the Honorable Ruth Bader Ginsburg, and the Honorable Stephen G. Breyer, Associate Justices of the Supreme Court. See Seibert, 542 U.S. at 603. Justice Breyer filed a concurrence, and Justice

In Seibert, a young boy with cerebral palsy died in his sleep, and his mother feared charges of neglect, because the boy's body was covered in bedsores.  See Seibert, 542 U.S. at 604.  The mother, along with two of her remaining sons and family friends, conspired to conceal the evidence of neglect by burning the family's mobile home with the boy's dead body in it.  See Seibert, 542 U.S. at 604.  To avoid the appearance that they had left the boy unattended, they arranged for Donald Rector, a mentally-ill teenager living with the family, to remain in the mobile home while they set fire to it.  See Seibert, 542 U.S. at 604.  The conspirators executed their plan, and Rector died in the fire.  See Seibert, 542 U.S. at 604.

Missouri officers subsequently arrested the mother.  See Seibert, 542 U.S. at 604.  Officer Kevin Clinton refrained from issuing her a Miranda warning on instructions from police headquarters.  See Seibert, 542 U.S. at 604.  Another officer, Richard Hanrahan, questioned her at the police station for thirty-forty minutes without a Miranda warning, and she eventually admitted that Rector "was meant to die in the fire."  Seibert, 542 U.S. at 605.  After a twenty-minute break, Hanrahan issued a Miranda warning, obtained a signed waiver of rights and secured the same confession with a similar line of questioning.  See Seibert, 542 U.S. at 605.  According to Hanrahan, he consciously decided to withhold the Miranda warning in accordance with a sanctioned interrogation technique that he had been taught: "question first, then give the warnings, and then repeat the question until he got the answer previously given."  Seibert, 542 U.S. at 600.

On appeal, the Supreme Court noted that Hanrahan's tactic of question first, issue Miranda warnings later, was not confined to Missouri.  See Seibert, 542 U.S. at 609.  The Supreme Court

Kennedy concurred in the judgment.  See Seibert, 542 U.S. at 617-18.  Justice O'Connor, joined by then-Chief Justice Rehnquist and Justices Scalia and Thomas, dissented.  See Seibert, 542 U.S. at 622.

further noted that such a tactic was at odds with Miranda's purpose; Miranda sought to ensure that

individuals made a "'free and rational choice,'" Seibert, 542 U.S. at 601 (quoting Miranda, 384

U.S. at 464-65), with full knowledge of their constitutional rights before speaking with officers,

whereas "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a

particularly opportune time to give them, after the suspect has already confessed," Seibert, 542

U.S. at 611.  The plurality continued:

> [I]t is likely that if the interrogators employ the technique of withholding warnings
> until after interrogation succeeds in eliciting a confession, the warnings will be
> ineffective in preparing the suspect for successive interrogation, close in time and
> similar in content. . . .  Upon hearing warnings only in the aftermath of interrogation
> and just after making a confession, a suspect would hardly think he had a genuine
> right to remain silent, let alone persist in so believing once the police began to lead
> him over the same ground again. . . .  What is worse, telling a suspect that "anything
> you say can and will be used against you," without expressly excepting the
> statement just given, could lead to an entirely reasonable inference that what he has
> just said will be used, with subsequent silent being of no avail.  Thus, when
> *Miranda* warnings are inserted in the midst of coordinated and continuing
> interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge
> essential to his ability to understand the nature of his rights and the consequences
> of abandoning them."

Seibert, 542 U.S. at 613-14 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)).  But see Seibert,

542 U.S. at 627 (O'Connor, J., dissenting)(critiquing these statements as adopting the "cat out of

the bag" theory that the Supreme Court rejected in Elstad).  Accordingly, the plurality held that

"[t]he threshold issue when interrogators question first and warn later is thus whether it would be

reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda*

requires." Seibert, 542 U.S. at 611-12 (quoting Miranda, 384 U.S. at 467).

The plurality concluded that the following factors bear on whether a midstream Miranda

warning can be effective:

> [(i)] the completeness and detail of the questions and answers in the first round of
> interrogation[; (ii)] the overlapping content of the two statements[; (iii)] the timing

- 82 -

and setting of the first and the second[; (iv)] the continuity of police personnel, and
[(v)] the degree to which the interrogator's questions treated the second round as
continuous with the first.

Seibert, 542 U.S. at 615.  In its analysis, the plurality added another factor: whether officers advise

the suspect that the pre-Miranda confession could not be used against him.  See Seibert, 542 U.S.

at 616 n.7.  Conspicuously absent from those factors is the officer's intent, but the plurality noted

that, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as

it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent

that show the question-first tactic at work."  542 U.S. at 616 n.6.  The plurality concludes that the

midstream Miranda warning was ineffective, because the pre- and post-Miranda questioning

occurred in the same location, the post-Miranda phase occurred only twenty minutes after the pre-

Miranda phase, the officers treated the two phases of questioning as continuous, and the pre-

Miranda phase left "little, if anything, of incriminating potential left unsaid."  Seibert, 542 U.S. at

616-17.

In so holding, the plurality contrasted Seibert with Elstad, and concludes that the officer's

failure to warn in Elstad was a good faith Miranda mistake, and that "any causal connection

between the first and second [admissions] to the police was 'speculative and attenuated.'"  Seibert,

542 U.S. at 615 (quoting Elstad, 470 U.S. at 313).  "In Elstad, it was not unreasonable to see the

occasion for questioning at the station house as presenting a markedly different experience from

the short conversation at home," because a reasonable person "could have seen the station house

questioning as a new and distinct experience."  Seibert, 542 U.S. at 615.  Moreover, the police

station interrogation went "well beyond the scope of the laconic prior admission" in the suspect's

living room.  542 U.S. at 614.  Justice Breyer concurred, noting that, "[i]n my view, the following

simple rule should apply to the two-stage interrogation technique: Courts should exclude the

'fruits' of the initial unwarned questioning unless the failure to warn was in good faith."  Seibert, 542 U.S. at 617 (Breyer, J., concurring).  He joined "the plurality's opinion in full," however, because he believed that "the plurality's approach in practice will function as a 'fruits' test." Seibert, 542 U.S. at 618 (Breyer, J., concurring)(quoting Wong Sun v. U.S., 371 U.S. at 477).

Justice Kennedy concurred in the judgment, but wrote separately and adopts a different test.  Seibert, 542 U.S at 622 (Kennedy, J., concurring).  First, he extrapolated a general principle from the Supreme Court's Miranda cases: "Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction."  Seibert, 542 U.S. at 618-19 (Kennedy, J., concurring).  From that general principle, he concluded that an officer's deliberate intent to withhold a Miranda warning in an effort to obtain a confession without informing a suspect of his rights "distorts the meaning of *Miranda* and furthers no legitimate countervailing interest."  Seibert, 542 U.S. at 621 (Kennedy, J., concurring).  He disagreed with the plurality, however, because the test the plurality articulated "cuts too broadly."  Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

> *Miranda's* clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity.  Cf. *Berkemer v. McCarty*, 468 U.S. 420, 430 . . . (1984).  I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.

Seibert, 542 U.S. at 622 (Kennedy, J., concurring).  Accordingly, Justice Kennedy articulated the following test:

> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

Seibert, 542 U.S at 622 (Kennedy, J., concurring).[10]

Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas, dissented.  See Seibert, 542 U.S. at 622 (O'Connor, J., dissenting).  The dissenting justices concluded that Elstad's voluntariness inquiry should control, and not a multi-factor balancing test or a subjective-intent test.  See Seibert, 542 U.S. at 622-23, 628 (O'Connor, J., dissenting).  According to those justices, a test focusing on the officer's subjective intent missed the mark, because "[f]reedom from compulsion lies at the heart of the Fifth Amendment," so the officer's state of mind is irrelevant.  Seibert, 542 U.S. at 624-25 (O'Connor, J., dissenting)("Thoughts kept inside a police officer's head cannot affect [the suspect's] experience.").  The plurality's approach, on the other hand, was defective, because it adopted the "cat out of the bag theory" that the Supreme Court had rejected in Elstad.  542 U.S. at 627 (O'Connor, J., dissenting).  The dissent noted that there are psychological effects on a suspect who confesses pre-Miranda and then endures questioning on the same subjects post-Miranda, but the Supreme Court had "refused to endo[w] those psychological effects with constitutional implications" in Elstad.  542 U.S. at 627 (O'Connor, J., concurring)(alteration in original).  The dissent explained that to adopt that approach "would effectively immuniz[e] a suspect to pre-Miranda warning questions from the consequences of his subsequent informed waiver, an immunity that comes at a high cost to legitimate law enforcement activity."  542 U.S. at 627 (O'Connor, J. dissenting)(alteration in original).  Accordingly, the dissent would have ordered a remand for the state court to determine whether the statements were voluntarily made.  See 542 U.S. at 628 (O'Connor, J. dissenting).

_____

[10]The Supreme Court later applied Seibert in a per curiam review of a habeas petition, but it did not resolve which test was controlling as it applied both the plurality's factors and factors which Justice Kennedy's concurrence articulated.  See Bobby v. Dixon, 565 U.S. 23, 30-32 (2011)(per curiam).

In United States v. Guillen, 995 F.3d 1095 (10th Cir. 2021), the Tenth Circuit held that "Justice Kennedy's concurrence is the binding opinion from Seibert." 995 F.3d at 1114. The Tenth Circuit arrived at this holding by applying the rule that, "'[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds."'" United States v. Guillen, 995 F.3d at 1114 (quoting Marks v. United States, 430 U.S. 188, 193 (1977)(quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976))). The Tenth Circuit explains that Justice Kennedy concurred with the plurality on the narrowest grounds and is "'a logical subset'" of the plurality opinion. United States v. Guillen, 995 F.3d at 1114 (quoting United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006). The Tenth Circuit joins the majority of Courts of Appeals in holding that "Justice Kennedy's Seibert opinion provides the controlling standard for assessing the admissibility of incriminating statements given subsequent to midstream Miranda warnings." United States v. Guillen, 995 F.3d at 1116 (citing United States v. Capers, 627 F.3d 470, 476 (2d Cir. 2010); United States v. Ollie, 442 F.3d 1135, 1142 (8th Cir. 2006); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006); United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006); United States v. Naranjo, 426 F.3d 221, 231-32 (3d Cir. 2005)(Alito, J., on the panel); United States v. Mashburn, 406 F.3d 303, 308-09 (4th Cir. 2005)).

## LAW REGARDING VOLUNTARINESS OF STATEMENTS

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause requires that, to be admissible, statements by a defendant must have been made voluntarily. See Dickerson,

530 U.S. at 433 ("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.")(citing Brown v. Mississippi, 297 U.S. 278 (1936), and Bram v. United States, 168 U.S. 532, 542 (1897)).

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction.

Jackson v. Denno, 378 U.S. 368, 376 (1964)(citation omitted).

The Supreme Court has declared that a defendant has the constitutional right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness." Jackson v. Denno, 378 U.S. at 376-77 (citation omitted). The United States must show that the statement was voluntary by a preponderance of the evidence. See Missouri v. Seibert, 542 U.S. at 608 n.1; Lego v. Twomey, 404 U.S. 477, 489 (1972)("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996)("The prosecution has the burden of proving by at least a preponderance of evidence that the confession was voluntary." (citation omitted)).

The due process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson, 530 U.S. at 434 (internal quotations omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). "The due process test takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Dickerson, 530 U.S. at 434 (internal quotations omitted)(citations omitted). The Court must weigh "the circumstances of

pressure against the power of resistance of the person confessing." <u>Dickerson</u>, 530 U.S. at 434 (internal quotations omitted)(quoting <u>Stein v. New York</u>, 346 U.S. 156, 185 (1953)). The Supreme Court reaffirmed this analysis in 2000. <u>See</u> <u>Dickerson</u>, 530 U.S. at 434 ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.").

The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." <u>Colorado v. Connelly</u>, 479 U.S. 157, 164 (1986). In reviewing its cases in which it suppressed evidence, the Supreme Court has recognized that "all have contained a substantial element of coercive police conduct." <u>Colorado v. Connelly</u>, 479 U.S. at 164.

The Court analyzed voluntariness in <u>United States v. Martinez</u>, No. CR 02-1055 JB, 2006 WL 4079686, at *13-14 (D.N.M. Nov. 21, 2006)(Browning, J.). There, it concluded that a defendant voluntarily confessed where he was in custody for five hours and interrogated for only about two hours. <u>See</u> 2006 WL 4079686, at *14. While the defendant argued that agents had made promises of leniency to him, the Court concluded that "the agents indicated to him that they could not make him any promises," and that his fate was in the hands of the judge and prosecutors. 2006 WL 4079686, at *14. The defendant also signed a Miranda waiver and a statement that no promises had been made to him. 2006 WL 4079686, at *14.

## <u>ANALYSIS</u>

First, the Court concludes that probable cause does not support the search warrant, but that the executing officers relied on the search warrant in good faith and the officers inevitably would have discovered the firearm. Second, the Court concludes that DeVargas did not clearly and

unequivocally assert that he wished to speak to a lawyer, and thus, his statements to the interviewing officer are voluntary.  Consequently, the Court will deny the Second MTS and the Third MTS.

I.     **THE COURT WILL DENY THE SECOND MTS, BECAUSE PROBABLE CAUSE SUPPORTS THE SEARCH WARRANT, OFFICERS RELIED ON THE SEARCH WARRANT IN GOOD FAITH, AND OFFICERS INEVITABLY WOULD HAVE DISCOVERED THE FIREARM IN DEVARGAS' HOME.**

DeVargas asks the Court to grant his Second MTS and suppress evidence of the firearm that officers found in his apartment, because, he contends, probable cause does not support the search warrant, the search warrant was so factually devoid that the executing officers did not rely on it in good faith, and officer would not inevitably have discovered the firearm.  The Court concludes that probable cause supports the search warrant, the executing officers relied on the search warrant in good faith and executing officers inevitably would have discovered the firearm.  Accordingly, the Court will deny the Second MTS.

A.     **PROBABLE CAUSE SUPPORTS THE SEARCH WARRANT.**

In determining whether probable cause supports a search warrant, the Court looks to the totality of the circumstances, see Florida v. Harris, 568 U.S. 237, 244 (2013), to determine if, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place," Illinois v. Gates, 462 U.S. 213, 238 (1983).  An affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "In making the probable cause determination, the issuing magistrate may draw reasonable inferences from the material provided in the warrant application."  United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

While a reviewing court "should afford a magistrate's probable cause decision great deference," it must still ensure that there is a "substantial basis for concluding that probable cause existed." United States v. Danhauer, 229 F.3d at 1006. Moreover, a "probable-cause determination is usually limited to the facts within the four corners of the search-warrant affidavit, but the Tenth Circuit has signaled that a Magistrate Judge can rely on information 'included in [other] sworn documents' to make a probable-cause determination." United States v. Sedillo, 297 F. Supp. 3d 1155, 1186 n.13 (D.N.M. 2017)(Browning, J.)(quoting Kaiser v. Lief, 874 F.2d 732, 735 (10th Cir. 1989)(alteration in United States v. Sedillo, but not in Kaiser v. Lief).

"Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990). "A nexus between the objects to be seized and the place to be searched for them is established when the circumstances set out in the affidavit would warrant a person of reasonable caution to believe that the articles sought would be found at the place to be searched." United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997). The Tenth Circuit has noted, however, that there does not need to be "direct evidence or personal knowledge that the items sought are located at the place to be searched," and it is sufficient for courts to "rely on the opinion of police officers as to where contraband may be kept." United States v. Hargus, 128 F.3d at 1262. In United States v. Gonzales, the Tenth Circuit acknowledges that an affidavit "clearly lacked probable cause as it failed to establish any connection between the place to be searched and Mr. Gonzales or the suspected criminal activity." United States v. Gonzales, 399 F.3d at 1228. In United States v. Gonzales, the Tenth Circuit notes:

> The supporting affidavit identified "321 E. Church" as the place to be searched and detailed Mr. Gonzales's accident and the resulting inventory search. The detective also stated that he had two years of law enforcement experience and that he "knows

> from Police training and experience that firearm [sic] are often kept at the residence
> as well as in vehicles." [App.] at 18. However, the affidavit never specified that 321
> E. Church was Mr. Gonzales's residence or that there was any other connection
> between that location and Mr. Gonzales, the vehicle, or the suspected criminal
> activity.

United States v. Gonzales, 399 F.3d at 1227-28 (first alteration in original; second alteration added).

When probable cause is based on information a confidential informant ("CI") supplies, "the court makes a probable cause determination based on the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge." United States v. Hendrix, 664 F.3d 1334, 1338 (10th Cir. 2011)(citing Illinois v. Gates, 462 U.S. 213(1983)). "'In testing the sufficiency of probable cause for an officer's action . . . [,] he may rely upon information received through an informant, rather than upon his direct observation, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'" United States v. Mathis, 357 F.3d 1200, 1204 (10th Cir. 2004)(quoting Jones v. United States, 362 U.S. 257, 269 (1960)). The information on which an officer relies to support information an informant provides "may be circumstances showing the trustworthiness of the informant, such as a history of providing accurate (corroborated) information." United States v. Long, 774 F.3d 653, 659 (10th Cir. 2014). If a CI's information is reliable, then probable cause can be based solely on information from that informant. See United States v. Long, 774 F.3d at 660.

At the outset, DeVargas acknowledges that, as a whole, the search warrant affidavit contains "a morass of allegations, evidence, confidential sources, targets, and places to be searching -- most of it fairly compelling" as it relates to other members of the BTL gang, but DeVargas contends that the search warrant affidavit does not tie DeVargas' residence to suspected criminal activity. Second MTS at 12-13. DeVargas further argues that the warrant does not "allege

that anything criminal ever happens in Mr. DeVargas' home, that any specific type of criminally relevant evidence might likely be there, or say much of anything at all about the premises other than that Mr. DeVargas lives there." Second MTS at 11-12. DeVargas also asserts that the search warrant affidavit does not support with a factual basis CHS-4's reliability, and, even if the affidavit adequately supports CHS-4's reliability, that CHS-4's statement that DeVargas would sometimes act as a lookout for the BTL does not support the conclusion that DeVargas would have evidence of the BTL conspiracy in his home. See Second MTS at 12.

The United States argues that probable cause supports the search warrant, because the search warrant affidavit articulates that officers would find "firearms, drug, and gang affiliation evidence" at DeVargas' home. Second MTS Response at 8. The United States asserts that the search warrant affidavit is based on a reliable CI, training and experience of a law enforcement officer, and DeVargas' criminal history. See Second MTS Response at 8. The United States notes that the search warrant affidavit attests that "CHS-4 had worked with the FBI for several years and had consistently provided reliable information, leading to the issuance of at least 27 federal search warrant[s], multiple arrests and the collection of illegal contraband." Second MTS Response at 9 (citing Search Warrant Application at 16-17). The United States also argues that CHS-4's information was corroborated, because CHS-4's information about DeVargas' conduct on April 10, 2021, "matched with the facts of Defendant's arrest." Second MTS Response at 10. Finally, the United States argues that there is a sufficient nexus between the criminal activity and DeVargas' residence, because the affiant officer stated that members of gangs often possess firearms in their homes. See Second MTS Response at 12.

The Court concludes that probable cause supports the search warrant, because the search warrant affidavit contains sufficient, reliable information connecting criminal activity to

DeVargas' residence.  First, the Court agrees with the United States that the search warrant

affidavit sufficiently establishes CHS-4's reliability.  The search warrant affidavit establishes:

> **CHS-4** is a street and prison gang associate of BTL and has been for
> approximately 20 years.  CHS-4 knows several veteran BTL street gang members
> and at one time, CHS-4 distributed heroin with and among members of the BTL.
> During that period of time, CHS-4 relied on members of the BTL and a related
> prison gang for protection and to help CHS-4 collect drug debts.  Over the past few
> years, CHS-4 aided me in the collection of evidence against gang members and
> associates.  Information provided by CHS-4 led to the issuance of at least 27 federal
> search warrants, the arrest of multiple suspects, and the recovery of firearms,
> ammunition, U.S. currency and significant quantities of controlled substances.
> CHS-4 is motivated to assist the FBI to help reduce violent crime and drugs in the
> community. . . .  I consider the information CHS-4 provided to be reliable because
> much of it was corroborated through law enforcement investigation, controlled
> buys, and both physical and electronic surveillance.  To my knowledge, CHS-4's
> information has not been found to be false or misleading.

Search Warrant Application ¶ 40, at 16.  In United States v. Manning, 635 F. App'x 404 (10th Cir.

2015)(unpublished), the Tenth Circuit concludes that a CI was reliable where the affiant officer

explained that the CI had worked with police for several years, "had provided information 'in

excess of three occasions,' and that this assistance led to the issuance of search warrants, seizures

of cocaine and marijuana, and resulted in arrests and charges."  United States v. Manning, 635 F.

App'x at 407 (no citation for quotation).  Moreover, in United States v. Long, 774 F.3d 653 (10th

Cir. 2014), the Tenth Circuit concludes that a CI's history of providing accurate information

indicates that a CI is reliable.  See 774 F.3d at 659 ("Here, the affidavit sufficed because the

informant's statement was corroborated by the affiant's assertions of the informant's prior accuracy

in reporting on cocaine offenses and the informant's expertise on cocaine trafficking.").  See also

United States v. Manning, 635 F. App'x at 407 (noting that the affiant officer's statement that the

"informant had never given 'untrue or misleading' information" indicates the CI's reliability)(no

citation for quotation).  Similarly, the search warrant establishes CHS-4's reliability, because

CHS-4 worked with the affiant officer on a number of occasions, helped secure twenty-seven arrests, and helped officers secure contraband.  See Search Warrant Application ¶ 40, at 16.  The affiant officer also attests that CHS-4 is reliable and has not provided false or misleading information in the past, and because independent investigation often corroborates CHS-4's information.

The search warrant affidavit also establishes that CHS-4 had a first-hand basis of knowledge, because CHS-4 is a "close associate" of DeVargas.  Search Warrant Application ¶ 107, at 34.  Additionally, CHS-4 informed the affiant officer that, when DeVargas was arrested in April, 2021, "he led the deputy away from a BTL drug house before submitting to arrest."  Search Warrant Application ¶ 107, at 34.  This statement is in-line with the facts of DeVargas' arrest, in which, when a deputy approached DeVargas, DeVargas pedaled faster and turned down a dead-end road.  See Findings of Fact ¶ 9, supra at 5.  The Court concludes, therefore, that CHS-4's information is reliable and sufficiently based on first-hand knowledge of DeVargas.

DeVargas contends most prominently, however, that the search warrant affidavit does not provide a sufficient nexus between criminal activity and DeVargas' residence.  In the search warrant affidavit, the affiant officer states that, based on her experience and expertise, she has "learned individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports and outbuildings," Search Warrant Application ¶ 20, at 10, that "members of the BTL . . . possess firearms, to include rifles, shotguns, and handguns," Search Warrant Application ¶ 23, at 11, that "[m]embers and associates of the BTL are expected to possess and maintain weapons and firearms," Search Warrant Application ¶ 23, at 11, and that firearms "are often stored by members

of gang/criminal enterprises . . . on their person, in their businesses, residences, garages, outbuildings, and yards, the residences of friends or relatives, and in vehicles," Search Warrant Application ¶ 24, at 11.   The Tenth Circuit has held that the nexus "linking an individual's suspected illegal activity to his home [can] come in the form of an affiant officer's statement that certain evidence -- in his or her professional experience -- is likely to be found in a defendant's residence."  United States v. Biglow, 562 F.3d at 1279.   See United States v. Sanchez, 555 F.3d 910, 914 (10th Cir. 2009)("[W]hen police officers have probable cause to believe that a suspect is involved in drug distribution, there is also probable cause to believe that additional evidence of drug-trafficking crimes (such as drug paraphernalia or sales records) will be found in his residence.").  Additionally, the Tenth Circuit states that "an affiant officer need not draw an explicit connection between a suspect's activities and his residence for a Fourth Amendment nexus to exist."  United States v. Biglow, 562 F.3d at 1280.  The Court concludes, therefore, that the search warrant affidavit sufficiently links DeVargas' criminal activity to his residence, because the affiant officer attests that DeVargas -- who, the affidavit notes, had pending charges for being a felon in possession of a firearm -- was an alleged BTL member, that BTL members "are expected to possess and maintain weapons and firearms," Search Warrant Application ¶ 23, at 11, and that firearms "are often stored by members of gang/criminal enterprises . . . on their person, in their businesses, residences . . . ," Search Warrant Application ¶ 24, at 11.  Consequently, the Court concludes that the information that CHS-4 provides -- that DeVargas was a BTL member who possessed firearms and worked as a lookout for BTL -- and the affiant officer's statements that, in her experience, gang members often possess firearms in their home, are sufficient to establish probable cause with respect to DeVargas.  Accordingly, the Court will deny the Second MTS.

## B.   THE OFFICERS RELIED ON THE SEARCH WARRANT IN GOOD FAITH.

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the United States generally is prohibited from using that evidence in a criminal prosecution of that person.  See Sanchez-Llamas v. Oregon, 548 U.S. at 332-33.  The exclusionary rule applies if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d at 999.  Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999.  Recognizing that the exclusionary rule's "sole purpose" "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith.  United States v. Davis, 564 U.S. at 236-37.  To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule."  United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. at 907).

"Under the good-faith exception to the exclusionary rule, '[i]f a warrant is not supported by probable cause, the evidence seized pursuant to the warrant need not be suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate.'"  United States v. Augustine, 742 F.3d 1258, 1262 (10th Cir. 2014)(quoting United States v. Campbell, 603 F.3d 1218, 1225 (10th Cir.2010)(alteration in United States v. Augustine)).  A law enforcement officer is presumed to act in good faith when he or she relies on and executes a search warrant, because "'[i]t is a sound presumption that the magistrate is more

qualified than the police officer to make a probable cause determination." United States v. Edwards, 813 F.3d at 971 (quoting Malley v. Briggs, 475 U.S. 335, 346 n. 9 (1986)(alteration in United States v. Edwards)). "[P]olice officers should be entitled to rely upon the probable-cause determination of a neutral magistrate when defending an attack on their good faith for either seeking or executing a warrant." United States v. Tuter, 240 F.3d at 1300 (quoting United States v. Corral-Corral, 899 F.2d 927, 939 (10th Cir. 1990)). "The question . . . is not whether the Magistrate erred in believing there was sufficient probable cause to support the scope of the warrant he issued. It is instead whether the Magistrate so obviously erred that any reasonable officer would have recognized the error." Messerschmidt v. Millender, 565 U.S. 535, 556 (2012). Moreover, the Supreme Court has identified four scenarios in United States v. Leon in which suppression is the proper remedy for a search warrant's improper issuance:

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth." Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role." Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922).

DeVargas argues that the Court should not apply the good-faith exception, because the "warrant affidavit lacks any indicia of probable cause because it is devoid of facts that would reliably suggest or provide a basis of knowledge to believe that there was a reason to search Mr. DeVargas' residence." Second MTS at 2. The United States counters, arguing that, if the affidavit in this case lacks probable cause, it is "not so lacking in probable cause as to render the officers' belief in its validity objectively unreasonable." Second MTS Response at 17. As discussed above,

the search warrant affidavit establishes probable cause.  See Analysis I.A. supra at 91.  Even if the search warrant affidavit does not establish probable cause, however, the Court agrees with the United States that the search warrant affidavit is not so lacking in probable cause to render the officers' reliance on the search warrant objectively unreasonable.  First, the search warrant affidavit contains specific information from CHS-4, who is DeVargas' close associate, that DeVargas is a BTL member who acted as a lookout for BTL and who, on at least one occasion, led police away from a BTL drug house.  See Search Warrant Application ¶ 107, at 34.  Moreover, the search warrant affidavit also establishes that, based on the affiant officer's experience, BTL members are expected to carry firearms, and gang members often keep firearms at their homes.  See Search Warrant Application ¶¶ 23-24, at 11.  Officers who rely on a search warrant signed by a Magistrate Judge are entitled to a presumption of good faith, see United States v. Edwards, 813 F.3d at 971, and Magistrate Judge Fashing did not "so obviously err[]" in making a probable cause determination -- if she erred at all -- "that any reasonable officer would have recognized the error."  Messerschmidt v. Millender, 565 U.S. at 556.  Instead, officers reasonably relied on the facts in the affidavit that establish that DeVargas is a BTL member, that BTL members are expected to possess firearms, and that gang members often keep firearms in their residences.  See Search Warrant Application ¶¶ 23-24, at 11; id. at ¶ 107, at 34.  Additionally, the Tenth Circuit notes in United States v. Gonzales, 399 F.3d 1225 (10th Cir. 2005), that "good faith may exist when a minimal nexus between the place to be searched and the suspected criminal activity is established."  United States v. Gonzales, 399 F.3d at 1231.  Even if the affiant officers' statement that gang members often keep firearms in their homes is not sufficient to support a probable cause finding, at the very least, it establishes a minimal nexus between criminal activity and the place to be searched to support the good-faith exception's application.  See United States v. Gonzales, 399

F.3d at 1231 (noting that the detective's statement that "firearm [sic] are often kept at the residence" is insufficient to support probable cause where the affiant officer did not provide any facts that the residence to be searched belonged to the defendant, but noting that, "[w]here we have relied on similar statements, it was clear the place to be searched was the suspect's residence; thus, giving meaning to the officer's statement").   Consequently, the Court concludes that, even if the search warrant lacks probable cause, it is not so devoid of factual allegations regarding DeVargas to render the executing officers' reliance on the search warrant objectively unreasonable.

### C.   THE OFFICERS INEVITABLY WOULD HAVE DISCOVERED THE FIREARM.

Under the inevitable discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"   United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. at 444).   "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."   United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).   While the exclusionary rule exists to deter police misconduct, so that "the prosecution is not . . . put in a better position than it would have been in if no illegality had transpired," the inevitable-discovery doctrine serves the opposite purpose, ensuring that the prosecution is not put "in a worse position, because the police would have obtained that evidence if no misconduct had taken place." Nix v. Williams, 467 U.S. at 444. For the inevitable discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence.   United States v. Owens, 782 F.2d at 152. "'[W]hat makes a discovery 'inevitable' is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the

search.'"  United States v. Souza, 223 F.3d 1197, 1204 (10th Cir. 2000)(quoting United States v. Brown, 64 F.3d 1083, 1085 (7th Cir. 1995)(alteration in original)).  "[A] court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means."  United States v. Souza, 223 F.3d at 1205.

The United States argues that, even if probable cause does not support the search warrant, and officers did not rely on the search warrant in good faith, officers inevitably would have discovered the firearm in DeVargas' apartment when they arrested him.  See Second MTS Response at 18.  The United States contends that, even if officers did not have the search warrant, officers had a valid arrest warrant for DeVargas, which they would have executed at his home, and that officers would have been permitted to enter DeVargas' residence to execute the arrest warrant, where they would have seen the firearm.  See Second MTS Response at 19.  The United States also argues that the firearm plainly was visible from the doorway of DeVargas' house and that the United States would have obtained a search warrant for the home upon observing the firearm.  See Second MTS Response at 20.  DeVargas contends, on the other hand, that, "absent a valid search warrant of the residence and property, which was completely fenced off and locked, the intrusion into Mr. DeVargas' residence could only go so far as necessary to effectuate the arrest warrant," and that officers could "only breach the doorway of his home if necessary to effectuate the arrest or ensure officer safety."  Second MTS Reply at 5.  Moreover, DeVargas argues that, for officers to observe the rifle in DeVargas' bedroom, officers would have to "break through a locked gate, go up an enclosed ramp and porch, and then enter the front doorway of Mr. DeVargas' residence" to see into his bedroom.  Second MTS Reply at 5.  DeVargas also notes that officers spotted the rifle only after DeVargas came to the door, after he exited his home, and after he was arrested, and

therefore, based on the arrest's circumstances, officers would not inevitably have seen the rifle. See Second MTS Reply at 5.  DeVargas also argues that it was not immediately apparent that "the rifle was a firearm which Mr. DeVargas could not possess," because it could have been an air rifle, which DeVargas was not prohibited from possessing.  Second MTS Reply at 6-7.

The Court concludes that officers inevitably would have discovered the rifle.  While the Court agrees with DeVargas that officers would not necessarily have entered his home to effectuate the arrest warrant, see Payton v. New York, 445 U.S. at 590, the Court agrees with the United States that officers would have approached DeVargas' front door, where officers would have observed the rifle, see Second MTS Response at 20.  Ubbelohde testified that, absent a search warrant, an officer would have approached the front door to ensure that there were not any other people present on the scene who could present a security risk to officers, and to document the damage, or lack thereof, to protect the FBI from any damages claims.  See Tr. at 53:1-3 (Kastrin, Ubbelohde); id. at 88:30-22 (Kastrin).  Moreover, DeVargas allowed officers to enter his home to get a shirt for him and to put DeVargas' dog inside his home after officers arrested DeVargas.  See Tr. at 55:6-11 (Kastrin, Ubbelohde); id. at 55:19-22 (Kastrin, Ubbelohde).  After reviewing photographs taken from the threshold of DeVargas' front door, see Photograph of DeVargas' Bedroom 1 (dated June 2, 2021), admitted as Government's Exhibit 5D at December 28, 2021, Hearing; Photograph of DeVargas' Bedroom 2 (dated June 2, 2021), admitted as Government's Exhibit 5E at December 28, 2021, Hearing; Photograph of DeVargas' Bedroom 3 (dated June 2, 2021), admitted as Government's Exhibit 5F at December 28, 2021, Hearing, the Court agrees with the United States that the rifle is plainly visible from the front door and that, after seeing the rifle and knowing that DeVargas' arrest warrant was for being a felon in possession, officers would have written a search warrant for DeVargas' home, see Tr. at 56:23-57-11 (Kastrin, Ubbelohde).

Even if  the rifle had turned out to be an air rifle, spotting a rifle that could not be distinguished from a real rifle would have supported probable cause.  Moreover, drug dealers do not usually keep air rifles, so the visible rifle readily supports a conclusion that the rifle was a real one and not an air rifle.  Finally, TFOs have a good knowledge of firearms and are not easily confused about firearms.  Accordingly, the Court will deny the Second MTS, because officers inevitably would have discovered the rifle in DeVargas' house absent the search warrant.

## II.   THE COURT WILL DENY THE THIRD MTS, BECAUSE DEVARGAS WAIVED HIS MIRANDA RIGHTS.

The Court will deny the Third MTS, because DeVargas did not assert his right to counsel, and because DeVargas voluntarily and knowingly waived his right to counsel.  First, the Court must consider whether DeVargas' statement -- "I have an attorney on this case." -- is a clear and unequivocal assertion to his right to counsel.  Recording of June 2, 2021 Interview.  Second, the Court must consider whether DeVargas voluntarily, knowingly, and intelligently waived his right to counsel.

### A.   DEVARGAS DID NOT ASSERT HIS RIGHT TO COUNSEL.

The Fifth and Fourteenth Amendments provide the accused a "right to have counsel present during custodial interrogation."  Edwards v. Arizona, 451 U.S. at 482.  In Miranda, the Supreme Court holds:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.  At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.  If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.  The Supreme Court expands on that principle in Edwards v. Arizona, concluding that, once an individual, subject to custodial interrogation, expresses a desire for counsel, that

individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. at 484-85.  See Edwards v. Arizona, 451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."); Davis v. United States, 512 U.S. at 458 ("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.").  "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Maryland v. Shatzer, 559 U.S. at 104 (quoting Edwards v. Arizona, 451 U.S. at 484-85).

> The rationale of *Edwards* is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect."

Maryland v. Shatzer, 559 U.S. at 104-05 (quoting Arizona v. Roberson, 486 U.S. 675, 681 (1988) (Arizona v. Roberson quoting Miranda, 384 U.S. at 467)).  Accordingly, "a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel."  Maryland v. Shatzer, 559 U.S. at 105.

The request for counsel must be clear and unequivocal.  See Davis v. United States, 512 U.S. at 459.  A "suspect need not 'speak with the discrimination of an Oxford don,'" Davis v. United States, 512 U.S. at 459 (quoting Davis v. United States, 512 U.S. at 476 (Souter, J.,

concurring)), but "[i]nvocation of the <u>Miranda</u> right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" <u>Davis v. United States</u>, 512 U.S. at 459 (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991)). The applicability of the rule that law enforcement cease custodial interrogation upon a clear request for counsel "requires courts to determine whether the accused actually invoked his right to counsel." <u>Davis v. United States</u>, 512 U.S. at 453. An individual's "ambiguous" or "equivocal" references to an attorney, regarding which "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning. <u>Davis v. United States</u>, 512 U.S. at 453 (emphasis in original). The Supreme Court later explains: "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" <u>Berghuis v. Thompkins</u>, 560 U.S. at 382 (quoting <u>Davis v. United States</u>, 512 U.S. at 461). "Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity." <u>Berghuis v. Thompkins</u>, 560 U.S. at 382. Moreover, the Tenth Circuit has held that "*Davis* does not require officers to ask clarifying questions in response to an equivocal or ambiguous statement . . . ." <u>United States v. Nelson</u>, 450 F.3d 1201, 1212 (10th Cir. 2006).

DeVargas argues that the Court should suppress the statements that he made to the TFO after his arrest, because he asserted his right to counsel. <u>See</u> Third MTS at 4. DeVargas asserts that his statements that he had an attorney on his case "are more than sufficient to find that a reasonable officer . . . would understand his statement to be a request for counsel." Third MTS at 4. Moreover, DeVargas contends that, "[a]t minimum, the Task Force Officer should have

inquired further to determine what Mr. DeVargas meant by his statement that he was represented by an attorney in this case." Third MTS at 6.  In response, the United States argues that DeVargas' statement that he has an attorney on the case "was an assertion of fact . . . , not a clear and unequivocal request for an attorney in relation to his arrest on the new federal complaint."  Third MTS Response at 5.  The United States asserts that DeVargas' statement is ambiguous and that, therefore, DeVargas waived his right to counsel.  See Third MTS Response at 5.  The United States contends that DeVargas' argument that the TFO should have clarified what DeVargas meant is a "tacit concession that Defendant's statement was unclear, as unambiguous statements do not need further inquiry to understand their meaning," Third MTS Response at 6, and that "[o]fficers do not have an obligation to clarify ambiguous or equivocal statements concerning the right to counsel," Third MTS Response at 6 (citing Berghuis v. Thompkins, 560 U.S. 370, 381 (2010); United States v. Nelson, 450 F.3d at 1212).

The Court concludes that DeVargas did not make an unambiguous request for counsel. The only statement that could be construed as a request for counsel is DeVargas' statement: "I have an attorney on this case."  Recording of June 2, 2021 Interview,  DeVargas' statement that he has an attorney in this case is no more than an assertion of fact that he has an attorney.  See United States v. Jourdain, 2007 WL 269827, at *22 ("Here, the statement given by Jourdain, that he 'had a lawyer,' was equivocal in the sense that it was reasonable for the officers to conclude that Jourdain was advising them of that fact, rather than asserting an interest in talking to the lawyer before responding to the officers' questions.")(no citation for quotation); Nunez v. Gibson, No. CV 12-04839-AB, 2018 WL 7501127, at *8 (C.D. Cal. Nov. 21, 2018)(Birotte, J.), report and recommendation adopted, 2019 WL 4201080 (C.D. Cal. Sept. 4, 2019)(McCormick, M.J.)(finding that the defendant's assertion that he had an attorney was not the same as the defendant asking for

an attorney and, therefore, it was not an unambiguous request for counsel).  Despite asserting that

he had an attorney, DeVargas did not express a desire to speak to his attorney, nor did DeVargas

express a desire to stop speaking with police.  Even more convincing, DeVargas agreed to continue

with the interview.  See Recording of June 2, 2021 Interview ("TFO:  Yea, yea, so we're going to

proceed.  Is that okay?  DeVargas: That's fine.")   DeVargas asserts that the TFO should have

clarified what DeVargas meant by his statement that he has an attorney on the case.  See Third

MTS at 6.  The Court notes, as a preliminary matter, that "[o]fficers are not required to ask

clarifying questions regarding an ambiguous statement, although 'it will often be good police

practice' to do so."   United States v. Coleman, 554 F. Supp. 3d 1124, 1148 (D.N.M.

2021)(Browning, J.)(quoting Davis v. United States, 512 U.S. at 461 (concluding that a question

about how long getting counsel would take is not a clear, express request for an attorney)).  Here,

despite not being required to clarify DeVargas' statement, the TFO responded to DeVargas'

statement by informing him that he had an attorney only on his State charges, reading DeVargas'

Miranda rights, and then asking: "[D]o you have any questions about what I read to you."

Recording of June 2, 2021 Interview.  DeVargas responds that he did not have any questions about

his Miranda rights, to which the TFO again asked, "Is there anything that I need to clarify for

you?", and to which DeVargas again responded, "No ma'am."  Recording of June 2, 2021

Interview.  Unprompted, DeVargas then asserted: "I know my rights."  Recording of June 2, 2021

Interview.  The TFO asked DeVargas if it was okay for them to proceed, to which DeVargas

responded: "That's fine."  Recording of June 2, 2021 Interview.  Despite not being required to

clarify an ambiguous statement, the TFO proceeded cautiously, and, in fact, clarifies whether

DeVargas understands his rights and wants to proceed.   Consequently, the Court concludes that

DeVargas did not assert clearly and unequivocally his right to counsel, and will, therefore, deny the Third MTS.

**B.    DEVARGAS VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY WAIVED HIS RIGHT TO COUNSEL.**

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently." United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008). An express statement is not required; the waiver can be inferred from the defendant's actions and words. See United States v. Nelson, 450 F.3d at 1211 (citing United States v. Toro-Pelaez, 107 F.3d at 825). "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" United States v. Burson, 531 F.3d at 1256 (quoting Maynard v. Boone, 468 F.3d at 676). The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurred. See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11. The Tenth Circuit has noted that this standard incorporates two distinct requirements:

> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)). In determining whether a waiver of rights is knowing and intelligent, the Tenth Circuit employs a totality-of-the-circumstances approach. See United States v. Burson, 531 F.3d at 1256-57 (citing Colorado v. Spring, 479 U.S. at 573). "In determining whether rights were

voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." United States v. Smith, 606 F.3d at 1276 (citing Smith v. Mullin, 379 F.3d at 934; United States v. Minjares-Alvarez, 264 F.3d at 985).

DeVargas contends that he did not waive properly his right to counsel, because he made two statements that he had an attorney on his case, to which the TFO responded that DeVargas' attorney represented him related only to charges against him in State court, which, DeVargas argues was a coercive statement. See Third MTS at 7. Consequently, DeVargas argues that he did not "knowingly and voluntarily waive[] his right to counsel because the Task Force Officer made representations to him based upon assumptions rather than inquiring further regarding DeVargas' request for counsel." Third MTS at 7. The United States, on the other hand, argues that DeVargas' waiver was knowing and voluntary. See Third MTS Response at 6. The United States argues that DeVargas' personal characteristics support the conclusion that his waiver is voluntary, because DeVargas "was a fifty-two-year-old adult male of at least average intelligence without any apparent mental defect that impaired his ability to exert his will." Third MTS Response at 8. Moreover, the United States notes that DeVargas acknowledges during the interview that this encounter with police was not his first interaction with the criminal justice system, see Third MTS Response at 8, and that DeVargas expressly states "I know my rights" after the TFO offers to explain his constitutional rights further, Third MTS Response at 9.

Considering the circumstances' totality, the Court concludes that DeVargas voluntarily, knowingly, and intelligently waived his right to counsel. First, the Court considers DeVargas' personal characteristics. See United States v. Smith, 606 F.3d at 1276 ("In determining whether

rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect."). DeVargas is a fifty-two-year-old male of ordinary intelligence, and there is no evidence that suggests DeVargas was otherwise impaired. See Third MTS Response at 8. Second, the parties do not dispute that the TFO gave DeVargas his Miranda warning and informed him of his rights. See Recording of June 2, 2021 Interview. Third, the entire length of the detention and interview with DeVargas was approximately ten minutes, which supports a finding that the interview and detention were not coercive. See Third MTS Response at 9; United States v. Woody, No. CR 18-3902 JB, 2020 WL 3513486, at *26 (D.N.M. June 29, 2020)(Browning, J.)(concluding that an interrogation that lasted an hour and fifteen minutes was not unduly coercive). The TFO's interrogation of DeVargas occurred immediately after his arrest, and the interaction's nature demonstrates that DeVargas understood the interview's nature. DeVargas has a prior criminal history, and, as the Tenth Circuit has held, "suspects with prior experience in the criminal justice system are more likely to have knowingly waived their Miranda rights because '[t]he concepts encompassed by Miranda [are] not foreign' to them." United States v. Goebel, 959 F.3d 1259, 1269 (10th Cir. 2020)(quoting Smith v. Mullin, 379 F.3d at 934)(first alteration added; second and third alterations in United States v. Goebel, but not in Smith v. Mullin). Indeed, DeVargas states, in no uncertain terms, "I know my rights." Recording of June 2, 2021 Interview. After asserting that the TFO does not need to clarify his rights, and that he knows his rights, DeVargas responds affirmatively when the TFO asks him: "[S]o we're going to proceed. Is that okay?" Recording of June 2, 2021 Interview. Finally, DeVargas does not allege, nor does the record support, a finding that the TFO ever used or threatened to use physical force against DeVargas. See Third MTS

Response at 9; Recording of June 2, 2021 Interview.  The TFO informing DeVargas that he has a lawyer only on his case regarding his State charges is not coercive; it is correct information that the TFO provides to DeVargas.  That statement alone cannot, as DeVargas asserts, support a finding of coercion.  In considering the totality of the circumstances of DeVargas' arrest and subsequent interrogation, the Court concludes that the TFO informs DeVargas of his <u>Miranda</u> rights, allows DeVargas to ask questions about his rights, and asks DeVargas for his consent to proceed.  The interrogation does not suggest that the TFO coerced DeVargas, or that DeVargas' <u>Miranda</u> waiver involuntary, unknowing, or unintelligent.  Accordingly, the Court will deny the Third MTS.

**IT IS ORDERED** that: (i) the Defendant's Second Motion to Suppress Evidence, filed November 10, 2021 (Doc. 74), is denied; and (ii) the Defendant's Third Motion to Suppress, filed November 9, 2021 (Doc. 73), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
  United States Attorney
Holland Kastrin
Timothy Trembley
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Carter B. Harrison, IV
Nicholas Thomas Hart
Harrison & Hart, LLC
Albuquerque, New Mexico

    *Attorneys for the Defendant*